## Case No. 102.

### In re AH FONG.

[3 Sawy. 144;[1] 13 Amer. Law. Reg. (N. S.) 761; 7 Chi. Leg. News, 17; 3 Amer. Law Rec. 403; 9 Amer. Law Rev. 359; 20 Int. Rev. Rec. 112; 1 Cent. Law J. 516.]

Circuit Court, D. California. Sept. 21, 1874.

POLICE POWER — EXCLUSION OF FOREIGNERS — TREATY WITH CHINA OF JULY 28, 1868 — FOURTEENTH AMENDMENT—CONFLICT OF STATE STATUTE WITH ACT OF CONGRESS.

1. The police power of the state may be exercised by precautionary measures against the increase of crime or pauperism, or the spread of infectious diseases from persons coming from other countries. The state may entirely exclude convicts, lepers and persons afflicted with incurable disease; may refuse admission to paupers, idiots and lunatics and others, who from physical causes are likely to become a charge upon the public until security is afforded that they will not become such a charge; and may isolate the temporarily diseased until the danger of contagion is gone.

2. The extent of the power of the state to exclude a foreigner from its territory is limited by the right of self-defense. Whatever outside of the legitimate exercise of this right affects the intercourse of foreigners with our people, their immigration to this country and residence therein, is exclusively within the jurisdiction of the general government, and is not subject to state control or interference.

3. The sixth article of the treaty between the United States and China, adopted on the twenty-eighth of July, 1868, provides that Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by citizens or subjects of the most favored nation, and as the general government has not seen fit to attach any limitation to the ingress into the United States of subjects of those nations, none can be applied [by a state] to the subjects of China.

[See Chae Chan Ping v. U. S., 9 Sup. Ct. Rep. 623, 130 U. S. 581.]

4. The fourteenth amendment to the constitution declares that no state shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person the equal protection of the laws: *Held*, that this equality of protection implies not only equal accessibility to the courts for the prevention or redress of wrongs, and the enforcement of rights, but equal exemption with others of the same class from all charges and burdens of every kind. Within these limits the power of the state exists, as it did previously to the

---

[1][Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

adoption of the amendment, over all matters of internal police.

[Cited in Re Tiburcio Parrott, 1 Fed. Rep. 511; The Railroad Tax Case, 13 Fed. Rep. 773; In re Lee Sing, 43 Fed. Rep. 362.]

5. On the thirty-first of May, 1870, congress passed an act declaring that "no tax or charge shall be imposed or enforced by any state upon any person immigrating thereto from a foreign country which is not equally imposed or enforced upon every person immigrating to such state from any foreign country, and any law of any state in conflict with this provision is hereby declared null and void:" *Held*, 1. That the term charge, as here used, means any onerous condition, and includes a condition which makes the right of an immigrant, arriving in the ports of the state, to land within the state depend upon the execution of a bond by a third party, not under his control, and whom he cannot constrain by any legal proceedings; and, 2. That the statute of California, which prohibits foreign immigrants of certain classes, arriving in the state of California by vessel, from landing until a bond shall have been given by the master, owner or consignee of the vessel that they will not become a public charge, and imposes no condition upon immigrants of the same class entering the state in any other way, is in conflict with the act of congress.

Application for discharge on writ of habeas corpus. The facts are stated in the opinion of the court.

T. I. Bergin and Leander Quint, for petitioner.

Thos. P. Ryan, Dist. Atty. of City and County of San Francisco, and M. M. Estee, contra.

FIELD, Circuit Justice. The petitioner alleges that she is illegally restrained of her liberty by the coroner of the city and county of San Francisco, and asks to be discharged from such restraint. The facts of the case, as detailed in the proceedings before us, are briefly as follows: The petitioner is a subject of the empire of China, and came to the port of San Francisco as a passenger on board of the American steamship Japan, owned by the Pacific Mail Steamship Company, and under the command as master, of J. H. Freeman. On the arrival of the steamship at this port, which was on the twenty-fourth of August last, she was boarded by the commissioner of immigration of California, who proceeded, under the provisions of a statute of the state, to examine into the character of the petitioner and other alien passengers. Upon such examination, the commissioner found, and so declared, that the petitioner and twenty-one other persons, also subjects of the Empire of China, arriving as passengers by the same steamship, were lewd and debauched women. He thereupon prohibited the master of the steamship from landing the women, unless he or the owner or consignee of the vessel gave the bonds required by the statute. Neither of the parties designated would consent to give the required bonds, and the women were consequently detained by the master on board of the steamship. They thereupon applied for a writ of habeas corpus to a district court of the state to inquire into the cause of their detention, alleging in their petition its illegality, on the ground that the statute, under which they were held, was in contravention of the treaty between the United States and the Empire of China, and in conflict with the constitution of the United States, and denying, also, that they were either lewd or debauched women. The district court granted the application, and heard the petitioners, and after the hearing, remanded them back to the charge of the master of the steamship, holding that the statute of California was neither in violation of the treaty nor the constitution, and that the evidence presented justified the finding of the commissioner, that the petitioners were lewd and debauched women. The petitioners thereupon applied to the chief justice of the state for another writ of habeas corpus, alleging the illegality of their restraint on grounds similar to those taken in the petition to the district court, and also alleging that they were, since the order of the district court remanding them to the custody of the master of the steamship, about to be forcibly returned to China against their will and consent. They therefore prayed that with the writ of habeas corpus a warrant might issue to the sheriff of the city and county of San Francisco to take them into his custody. The chief justice granted the writ, returnable before the supreme court of the state, and at the same time issued a warrant commanding the coroner of the city and county to take the parties into his custody and bring them before the court.

Under this warrant the parties were taken into the custody of the coroner, and in his custody they still remain. The supreme court sustained the ruling of the district court, and denied the application of the parties to be discharged, holding that the statute of the state, under which they were detained, was valid and binding under the treaty between the United States and China and the Constitution of the United States, and that the evidence justified the finding of the commissioner of immigration as to the character of the women. It therefore made an order directing that the coroner return the parties to the master or owner or consignee of the steamship Japan, on board of the steamship, and requiring such master, owner, or consignee to retain the parties on board of the steamship until she should leave this port, and then to carry them beyond the state. The order further provided, that in case the steamship Japan was not in the port of San Francisco, the coroner should retain the parties in his possession until the arrival in port of the steamship, and then enforce the order returning the parties to the vessel, or retain the parties until the further direction of the court. The petitioner is one of the women thus held by

the coroner, and she now invokes the aid of this court to be released from her restraint, alleging, as in the other applications, that the restraint is illegal, that the statute which is supposed to authorize it is in contravention of the treaty with China and the constitution of the United States, and averring that she is not within either of the classes designated in the statute. It further appears, from the special traverse to the return of the coroner, and it is admitted by counsel, that since the judgment of the supreme court, the steamship Japan has sailed from the port of San Francisco, and will not probably return under three months, and that Freeman has been discharged from the service of the steamship company, and is no longer master of the Japan. The decision of the district court, and of the supreme court of the state, although entitled to great respect and consideration from the acknowledged ability and learning of their judges, is not binding upon this court. The petitioner being an alien, and a subject of a country having treaty relations with the government of the United States, has a right to invoke the aid of the federal tribunals for her protection, when her rights, guarantied by the treaty, or the constitution, or any law of congress, are in any respect invaded; and is, of course, entitled to a hearing upon any allegation in proper form that her rights are thus invaded.

I proceed, therefore, to the consideration of the questions presented, notwithstanding the adjudications of the state tribunals.

The statute of the state, under which the petitioner was restrained of her liberty on board of the steamship, is found in the provisions of chapter I, tit. 7, of the Political Code, as amended by the last legislature. These provisions require the master of a vessel arriving at any port of this state, bringing passengers from any place out of the state, within twenty-four hours after its arrival, to make a written report under oath to the commissioner of immigration at such port, stating, among other things, the name, place of birth, last residence, age and occupation of all passengers who are not citizens, and whether any of the passengers thus reported "are lunatic, idiotic, deaf, dumb, blind, crippled or infirm, and not accompanied by any relatives able to support them, or are lewd or abandoned women." Then follow the special provisions which have given rise to the present proceeding. They are contained in section 2952 of the Code as amended. They require the commissioner of immigration "to satisfy himself whether or not any passenger who shall arrive in this state by vessels from any foreign port or place (who is not a citizen of the United States) is lunatic, deaf, dumb, blind, crippled or infirm, and is not accompanied by relatives who are able and willing to support him, or is likely to become permanently a public charge, or has been a pauper in any other country, or is, from sickness or disease, existing either at the time of sailing from the port of departure, or at the time of his arrival in this state, a public charge, or likely to become so, or is a convicted criminal, or a lewd or debauched woman;" and then declare that "no person who shall belong to either class, or who possesses any of the infirmities or vices specified herein, shall be permitted to land in this state, unless the master, owner or consignee of said vessel shall give a joint and several bond to the people of the state of California, in the penal sum of five hundred dollars, in gold coin of the United States, conditioned to indemnify and save harmless every county, city and county, town and city of this state, against all costs and expenses which may be by them necessarily incurred for the relief, support, medical care, or any expense whatever, resulting from the infirmities or vices herein referred to, of the persons named in said bonds, within two years from the date of said bonds; * * * and if the master, owner, or consignee of said vessel shall fail or refuse to execute the bond herein required to be executed, they are required to retain such persons on board of said vessel until said vessel shall leave the port, and then convey said passengers from this state; and if said master, owner or consignee shall fail or refuse to perform the duty and service last herein enjoined, or shall permit said passengers to escape from said vessel and land in this state, they shall forfeit to the state the sum of five hundred dollars, in gold coin of the United States, for each passenger so escaped, to be recovered by suit at law."

The provisions of this section are of a very extraordinary character. They make no distinction between the deaf, the dumb, the blind, the crippled and the infirm, who are poor and dependent, and those who are able to support themselves and are in possession of wealth and all its appliances. If they are not accompanied by relatives, both able and willing to support them, they are prohibited from landing within the state, unless a specified bond is given, not by them or such competent sureties as they may obtain, but by the owner, master or consignee of the vessel. Neither do the provisions of the statute make any distinction between a present pauper, and one who has been a pauper, but has ceased to be such. If the immigrant has ever been within that unfortunate class, notwithstanding he may have at the time ample means at his command, he must obtain the designated bond or be excluded from the state. They subject also to the same condition, and possible exclusion, the passenger whose sickness or disease has been contracted on the passage, as well as the passenger who was sick or diseased on his departure from the foreign port. It matters not that the sickness may have been produced by exertions

for the safety of the ship or passengers, or by attentions to their wants or health. If he is likely on his arrival to become a public charge, he must obtain the bond designated, or be denied a landing within the state. Nor does the statute make any distinction between the criminal convicted for a misdemeanor, or a felony, or for an offense malum in se, or one political in its character. The condemned patriot, escaping from his prison and fleeing to our shores, stands under the law upon the same footing with the common felon who is a fugitive from justice. Nor is there any difference made between the woman whose lewdness consists in private and unlawful indulgence, and the woman who publicly prostitutes her person for hire, or between the woman debauched by intemperance in food or drink, or debauched by the loss of her chastity.

A statute thus sweeping in its terms, confounding by general designation persons widely variant in character, is not entitled to any very high commendation. If it can be sustained as the exercise of the police power of the state as to any persons brought within any of the classes designated, it must be sustained as to all the persons of such class. That is to say, if it can be sustained when applied to the infirm who is poor and dependent, when unaccompanied by his relatives, able and willing to support him, it must be sustained when applied to the infirm who is surrounded by wealth and its attendants, if he is thus unaccompanied. If it can be sustained when applied to a woman whose debauchery consists in the prostitution of her person, it must be sustained when applied to a woman whose debauchery consists in her intemperance in food and drink; and even when applied to the repentant Magdalen who has once yielded to temptation and lost her virtue. The commissioner of immigration is not empowered to make any distinction between persons of the same class; and there is nothing on the face of the act which indicates that the legislature intended that any distinction should be made.

It is undoubtedly true that the police power of the state extends to all matters relating to the internal government of the state, and the administration of its laws, which have not been surrendered to the general government, and embraces regulations affecting the health, good order, morals, peace and safety of society. Under this power all sorts of restrictions and burdens may be imposed, having for their object the advancement of the welfare of the people of the state, and when these are not in conflict with established principles, or any constitutional prohibition, their validity cannot be questioned.

It is equally true that the police power of the state may be exercised by precautionary measures against the increase of crime or pauperism, or the spread of infectious diseases from persons coming from other countries; that the state may entirely exclude convicts, lepers and persons afflicted with incurable disease; may refuse admission to paupers, idiots, lunatics and others, who from physical causes are likely to become a charge upon the public until security is afforded that they will not become such a charge; and may isolate the temporarily diseased until the danger of contagion is gone. The legality of precautionary measures of this kind has never been doubted. The right of the state in this respect has its foundation, as observed by Mr. Justice Grier in The Passenger Cases, [7 How. (48 U. S.) 462,] in the sacred law of self-defense, which no power granted to congress can restrain or annul.

But the extent of the power of the state to exclude a foreigner from its territory is limited by the right in which it has its origin, the right of self-defense. Whatever outside of the legitimate exercise of this right affects the intercourse of foreigners with our people, their immigration to this country and residence therein, is exclusively within the jurisdiction of the general government, and is not subject to state control or interference. To that government the treaty-making power is confided; also, the power to regulate commerce with foreign nations, which includes intercourse with them as well as traffic; also the power to prescribe the conditions of migration or importation of persons, and rules of naturalization; whilst the states are forbidden to enter into any treaty, alliance, or confederation with other nations.

I am aware that the right of the state to exclude from its limits any persons whom it may deem dangerous or injurious to the interests and welfare of its citizens has been asserted by eminent judges of the supreme court of the United States. Mr. Chief Justice Taney maintained the existence of this right in his dissenting opinion in The Passenger Cases, and asserted that the power had been recognized in previous decisions of the court. The language of the opinion in the case of City of New York v. Miln, 11 Pet. [36 U. S.] 141, would seem to sustain this doctrine. But neither in The Passenger Cases nor in the case of City of New York v. Miln, did the decision of the court require any consideration of the power of exclusion, which the state possessed; and all that was said by the eminent judges in those cases upon that subject was argumentative and not necessary and authoritative.[2]

But independent of this consideration, we cannot shut our eyes to the fact that much which was formerly said upon the power of the state in this respect, grew out of the necessity which the southern states, in which the institution of slavery existed, felt of excluding free negroes from their limits. As

---

[2][See note at end of case.]

in some states negroes were citizens, the right to exclude them from the slave states could only be maintained by the assertion of a power to exclude all persons whom they might deem dangerous or injurious to their interests. But at this day no such power would be asserted, or if asserted, allowed, in any federal court. And the most serious consequences affecting the relations of the nation with other countries might, and undoubtedly would, follow from any attempt at its exercise. Its maintenance would enable any state to involve the nation in war, however disposed to peace the people at large might be.

Where the evil apprehended by the state from the ingress of foreigners is that such foreigners will disregard the laws of the state, and thus be injurious to its peace, the remedy lies in the more vigorous enforcement of the laws, not in the exclusion of the parties. Gambling is considered by most states to be injurious to the morals of their people, and is made a public offense. It would hardly be considered as a legitimate exercise of the police power of the states to prevent a foreigner who had been a gambler in his own country from landing in ours. If, after landing, he pursues his former occupation, fine him, and, if he persists in it, imprison him, and the evil will be remedied. In some states the manufacture and sale of spirituous and intoxicating liquors are forbidden and punished as a misdemeanor. If the foreigner coming to our shores is a manufacturer or dealer in such liquors, it would be deemed an illegitimate exercise of the police power to exclude him, on account of his calling, from the state. The remedy against any apprehended manufacture and sale would lie in such case in the enforcement of the penal laws of the state. So if lewd women, or lewd men, even if the latter be of that baser sort, who, when Paul preached at Thessalonica, set all the city in an uproar (Acts xvii, verse 5), land on our shores, the remedy against any subsequent lewd conduct on their part must be found in good laws or good municipal regulations and a vigorous police. It is evident that if the possible violation of the laws of the state by an immigrant, or the supposed immorality of his past life or profession, where that immorality has not already resulted in a conviction for a felony, is to determine his right to land and to reside in the state, or to pass through into other and interior states, a door will be opened to all sorts of oppression. The doctrine now asserted by counsel for the commissioner of immigration, if maintained, would certainly be invoked, and at no distant day, when other parties, besides low and despised Chinese women, are the subjects of its application, and would then be seen to be a grievous departure from principle.

I am aware of the very general feeling prevailing in this state against the Chinese, and in opposition to the extension of any encouragement to their immigration hither. It is felt that the dissimilarity in physical characteristics, in language, in manners, religion and habits, will always prevent any possible assimilation of them with our people. Admitting that there is ground for this feeling, it does not justify any legislation for their exclusion, which might not be adopted against the inhabitants of the most favored nations of the Caucasian race, and of Christian faith. If their further immigration is to be stopped, recourse must be had to the federal government, where the whole power over this subject lies. The state cannot exclude them arbitrarily, nor accomplish the same end by attributing to them a possible violation of its municipal laws. It is certainly desirable that all lewdness, especially when it takes the form of prostitution, should be suppressed, and that the most stringent measures to accomplish that end should be adopted. But I have little respect for that discriminating virtue which is shocked when a frail child of China is landed on our shores, and yet allows the bedizened and painted harlot of other countries to parade our streets and open her hells in broad day, without molestation and without censure. By the fifth article of the treaty between the United States and China, adopted on the twenty-eighth of July, 1868,[3] the United States and

[3] [The fifth and sixth articles of the treaty of July 28, 1868, with the emperor of China are as follows: "Art. 5. The United States of America and the emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration, and emigration of their citizens and subjects, respectively, from the one country to the other, for the purposes of curiosity, of trade, or as permanent residents. The high contracting parties, therefore, join in reprobating any other than an entirely voluntary emigration for these purposes. They consequently agree to pass laws making it a penal offense for a citizen of the United States or Chinese subjects to take Chinese subjects either to the United States, or to any other foreign country, or for a Chinese subject or citizen of the United States to take citizens of the United States to China or to any other foreign country, without their free and voluntary consent, respectively." "Art. 6. * * * And, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon subjects of China in the United States." 16 Stat. 740. This treaty was afterwards modified by the treaty of November 17, 1880, (22 Stat. 826,) which provides that, whenever the government of the United States is of opinion that the immigration of Chinese laborers is likely to endanger the good order of said country or of any locality within its borders, the government "may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it." It was further provided that the limitation or suspension shall be reasonable, and shall only extend to the class known as "laborers." Privilege was also given Chinese sub-

the emperor of China recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to another, for purposes of curiosity or trade, or as permanent residents. The sixth article declares that citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities or exemptions in respect to travel or residence as may there be enjoyed by citizens or subjects of the most favored nation; and, reciprocally, that Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may there be enjoyed by citizens or subjects of the most favored nation.

The only limitation upon the free ingress into the United States and egress from them of subjects of China is the limitation which is is applied to citizens or subjects of the most favored nation; and as the general government has not seen fit to attach any limitation to the ingress of subjects of those nations, none can be applied to the subjects. of China. And the power of exclusion by the state, as we have already said, extends only to convicts, lepers and persons incurably diseased, and to paupers and persons who, from physical causes, are likely to become a public charge. The detention of the petitioner is therefore unlawful under the treaty.

But there is another view of this case equally conclusive for the discharge of the petitioner, which is founded upon the legislation of congress since the adoption of the fourteenth amendment. That amendment in its first section designates who are citizens of the United States, and then declares that no state shall make or enforce any law which abridges their privileges and immunities. It also enacts that no state shall deprive "any person" (dropping the distinctive designation of citizens) of life, liberty, or property, without due process of law; nor deny to any person the equal protection of the laws. The great fundamental rights of all citizens are thus secured against any state deprivation, and all persons, whether native or foreign, high or low, are, whilst within the jurisdiction of the United States, entitled to the equal protection of the laws. Discriminating and partial legislation, favoring particular persons, or against particular persons of the same class, is now prohibited. Equality of privilege is the constitutional right of all citizens, and equality of protection is the constitutional right of all persons. And equality of protection implies not only equal accessibility to the courts for the prevention or redress of wrongs, and the enforcement

---

jects already within the United States to go and come of their own free will and accord, with "all the rights, privileges. immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."]

of rights, but equal exemption with others of the same class from all charges and burdens of every kind. Within these limits the power of the state exists. as it did previously to the adoption of the amendment, over all matters of internal police. And within these limits the act of congress of May 31, 1870, restricts the action of the state with respect to foreigners immigrating to our country. "No tax or charge," says the act, "shall be imposed or enforced by any state upon any person immigrating thereto from a foreign country which is not equally imposed or enforced upon every person immigrating to such state from any other foreign country, and any law of any state in conflict with this provision is hereby declared null and void." 16 Stat. 144.

By the term "charge." as here used. is meant any onerous condition, it being the evident intention of the act to prevent any such condition from being imposed upon any person immigrating to the country which is not equally imposed upon all other immigrants, at least upon all others of the same class. It was passed under and accords with the spirit of the fourteenth amendment. A condition which makes the right of the immigrant to land depend upon the execution of a bond by a third party, not under his control, and whom he cannot constrain by any legal proceedings, and whose execution of the bond can only be obtained upon such terms as he may exact, is as onerous as any charge which can well be imposed. and must, if valid, generally lead, as in the present case, to the exclusion of the immigrant.

The statute of California which we have been considering imposes this onerous condition upon persons of particular classes on their arrival in the ports of the state by vessel, but leaves all other foreigners of the same classes entering the state in any other way, by land from the British possessions or Mexico, or over the plains by railway, exempt from any charge. The statute is therefore in direct conflict with the act of congress.

It follows. from the views thus expressed, that the petitioner must be discharged from further restraint of her liberty; and it is so ordered.

NOTE, [from original report.] The only point involved and decided in the case of City of New York v. Miln. 11 Pet. [36 U. S.] 102, was the constitutional power of the state of New York to compel the master of a vessel with passengers, arriving at her ports. from any country out of the United States, or from any other state of the United States, to report in writing, on oath. to the state authorities, under a prescribed penalty. the name. place of birth. and last legal settlement. age and occupation of every person brought as a passenger in the vessel. This the supreme court held that the state. in virtue of her general police powers, had the constitutional right to do. In the course of the opinions of Mr. Justice Barbour and Mr. Justice Thompson. general language is used indicating a power in the state to exclude persons from her limits whom she might deem dangerous to the ma-

terial or moral welfare of the state, but the language was wholly unnecessary to the decision of the only point then in judgment before the court. The facts of the two cases known as The Passenger Cases, 7 How. [48 U. S.] 283, were briefly these: One of the cases (Smith v. Turner) went to the supreme court on a writ of error from the court of errors of New York. The other case (Norris v. City of Boston) went to the supreme court of the United States from the supreme court of Massachusetts. The New York case arose substantially upon these facts: A statute of that state authorized the health commissioner to demand and receive, and in case of neglect or refusal to pay, to sue for and recover of and from the master of every vessel arriving in the port of New York from a foreign port, for himself and each cabin passenger, one dollar and fifty cents, and from the master of each coasting vessel for each person on board twenty-five cents; but coasting vessels from New Jersey, Connecticut and Rhode Island, were only required to pay for one voyage in each month. The moneys thus collected were denominated in the statute hospital moneys, and the master was authorized to sue and recover from each passenger the amount paid on his account. To the failure on the part of the master to pay within twenty-four hours after arrival of the vessel, was attached a penalty of one hundred dollars. All moneys collected from this source, in excess of the amount necessary to defray the hospital expenses, were to be paid over to the treasurer of the Society for the Reformation of Juvenile Delinquents, in the city of New York. Upon this statute, Smith, the master of the British ship Henry Bliss, was sued for $295. He demurred to the complaint, on the ground that so much of the statute as authorized a recovery was repugnant to the constitution of the United States. The demurrer was overruled in the state courts, and electing to stand upon his demurrer, the case was taken to the supreme court of the United States where the point was thus sharply presented to the court for decision. That tribunal, after the most exhaustive and elaborate arguments upon the question, decided that the act of the legislature of New York, in the particular case under consideration, was repugnant to the constitution of the United States, and void, and accordingly reversed the judgment of the court of errors of New York.

In the case of Norris v. City of Boston, the facts were substantially as follows: Norris, an inhabitant of St. Johns, in the province of New Brunswick, Kingdom of Great Britain, was master of a vessel belonging to the port of St. Johns: he arrived with nineteen alien passengers at the port of Boston. Prior to landing, he was compelled to pay, under a law of Massachusetts, to the city of Boston, two dollars for each passenger. The statute of Massachusetts authorized the municipal authorities to appoint examiners, whose duty it was to examine the condition of all passengers on board of any vessel arriving in port. If, upon such examination, there were found among said passengers "any lunatic, idiot, maimed, aged or infirm person," incompetent, in the opinion of the examining officer, to maintain himself, or who had been a pauper in another country, the passenger was not permitted to land, until the master, owner, consignee or agent of the vessel gave to the city a bond in the sum of one thousand dollars, with sufficient sureties, that such lunatic or indigent passenger would not become a city, town or state charge within ten years from the date of the bond, and for all alien passengers, other than those already specified, the master was required to pay two dollars for each passenger before they could land. Appropriate penalties were contained in the statute to secure compliance with its terms. Norris paid the two dollars for each passenger, as prescribed by the statute, under protest, landed his passengers, and thereupon instituted suit for the recovery of the money he had thus been compelled to pay. In the state courts judgment passed in favor of the defendant, when the case was taken to the supreme court of the United States upon a writ of error, where the judgment was reversed; that court holding the statute of Massachusetts, under which payment of the money was compelled, was unconstitutional and void. In the opinions of the justices in these celebrated cases, language is also used as in the case in 11 Pet. [36 U. S.] expressive of the right of the state, in exercise of its police power, to exclude persons from her limits; but from the statement of the cases, it is obvious that no such question was before the court.

Mr. Justice Wayne, one of the judges composing the majority of the court which decided the Passenger Cases, sums up the conclusions of the court, as follows (7 How. [48 U. S.] 412):

1. That the acts of New York and Massachusetts imposing a tax upon passengers, either foreigners or citizens, coming into the ports in those states, either in foreign vessels or vessels of the United States, from foreign nations or from ports in the United States, are unconstitutional and void, being in their nature regulations of commerce contrary to the grant in the constitution to congress of the power to regulate commerce with foreign nations and among the several States.

2. That the states of this Union cannot constitutionally tax the commerce of the United States for the purpose of paying any expense incident to the execution of their police laws; and that the commerce of the United States includes an intercourse of persons, as well as the importation of merchandise.

3. That the acts of Massachusetts and New York in question in these cases, conflict with treaty stipulations existing between the United States and Great Britain, permitting the inhabitants of the two countries "freely and securely to come, with their ships and cargoes, to all places, ports, and rivers in the territories of each country to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of said territories, respectively; also, to hire and occupy houses and warehouses for the purposes of their commerce, and generally the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject, always, to the laws and statutes of the two countries, respectively;" and that said laws are therefore unconstitutional and void.

4. That the congress of the United States having by sundry acts, passed at different times, admitted foreigners into the United States with their personal luggage and tools of trade, free from all duty or imposts, the acts of. Massachusetts and New York imposing any tax upon foreigners or immigrants for any purpose whatever, whilst the vessel is in transitu to her port of destination, though said vessel may have arrived within the jurisdictional limits of either of the states of Massachusetts or New York, and before the passengers have been landed, are in violation of said acts of congress, and therefore unconstitutional and void.

5. That the acts of Massachusetts and New York, so far as they impose any obligation upon the owners or consignees of vessels, or upon the captains of vessels or freighters of the same, arriving in the ports of the United States within the said states, to pay any tax or duty of any kind whatever, or to be in any way responsible for the same, for passengers arriving in the United States or coming from a port in the United States, are unconstitutional and void; being contrary to the constitutional grant to congress of the power to regulate commerce

with foreign nations, and among the several states, and to the legislation of congress under the said power, by which the United States have been laid off into collection districts, and ports of entry established within the same, and commercial regulations prescribed, under which vessels, their cargoes and passengers, are to be admitted into the ports of the United States, as well from abroad as from other ports of the United States. That the act of New York now in question, so far as it imposes a tax upon passengers arriving in vessels from other ports in the United States, is properly in this case before this court for construction; and that the said tax is unconstitutional and void. That the ninth section of the first article of the constitution includes within it the migration of other persons, as well as the importation of slaves, and in terms recognizes that other persons as well as slaves may be the subjects of importation and commerce.

6. That the fifth clause of the ninth section of the first article of the constitution, which declares that "no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another state; nor shall vessels bound to or from one state be obliged to enter, clear, or pay duties in another," is a limitation upon the power of congress to regulate commerce for the purpose of producing entire commercial equality within the United States, and also a prohibition upon the states to destroy such equality by any legislation prescribing a condition upon which vessels bound from one state shall enter the ports of another state.

7. That the acts of Massachusetts and New York, so far as they impose a tax upon passengers, are unconstitutional and void, because each of them so far conflicts with the first clause of the eighth section of the first article of the constitution, which enjoins that all duties, imposts, and excises shall be uniform throughout the United States; because the constitutional uniformity enjoined in respect to duties and imposts is as real and obligatory upon the states, in the absence of all legislation by congress, as if the uniformity had been made by the legislation of congress; and that such constitutional uniformity is interfered with and destroyed by any state imposing any tax upon the intercourse of persons from state to state, or from foreign countries to the United States.

8. That the power in congress to regulate commerce with foreign nations and among the several states includes navigation upon the high seas, and in the bays, harbors, lakes, and navigable waters within the United States, and that any tax by a state in any way affecting the right of navigation, or subjecting the exercise of the right to a condition, is contrary to the aforesaid grant.

9. That the states of this Union may, in the exercise of their police powers, pass quarantine and health laws, interdicting vessels coming from foreign ports, or ports within the United States, from landing passengers and goods, prescribe the places and time for vessels to quarantine, and impose penalties upon persons for violating the same; and that such laws, though affecting commerce in its transit, are not regulations of commerce prescribing terms upon which merchandise and persons shall be admitted into the ports of the United States, but precautionary regulations to prevent vessels engaged in commerce from introducing disease into the ports to which they are bound, and that the states may, in the exercise of such police power, without any violation of the power in congress to regulate commerce, exact from the owner or consignee of a quarantined vessel, and from the passengers on board of her, such fees as will pay to the state the cost of their detention and of the purification of the vessel, cargo, and apparel of the persons on board.