THE STATE OF KANSAS v. C. L. HAUN.

No. 11,309.*    (59 Pac. 340.)

1. CONSTITUTIONAL LAW—*Mines and Miners—"Scrip Law."* Chapter 145 of the Laws of 1897 (Gen. Stat. 1897, ch. 73, §§ 22–26), entitled "An act to secure to laborers and others the payment of their wages, and prescribing a penalty for the violation of this act, and repealing section 2441, 2442 and 2443 of the General Statutes of 1889, and all acts and parts of acts in conflict herewith," is not to be construed as an exercise by the legislature of its power to alter and amend corporate charters.

2. ———— *Invalid for Unjust Discrimination.* The act is unconstitutional and void in that it violates the fourteenth amendment to the constitution of the United States, which provides: . . . "Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Appeal from court of appeals, southern department; A. W. DENNISON, M. SCHOONOVER, and B. F. MILTON, judges, opinion filed December 9, 1899. Reversed.

STATEMENT.

THE appellant was convicted in the district court for a violation of chapter 145, Laws of 1897 (Gen. Stat. 1897, ch. 73, §§ 22–26 ), which reads:

---

*For opinion by court of appeals, see 7 Kan. App. 509, 54 Pac. 130.—REP.

The State v. Haun.

"An Act to secure to laborers and others the payment of their wages, and prescribing a penalty for the violation of this act, and repealing section 2441, 2442 and 2443 of the General Statutes of 1889, and all acts and parts of acts in conflict herewith.

'Be it enacted by the Legislature of the State of Kansas:

" Section 1. It shall be unlawful for any person, firm, company, corporation, or trust, or the agent, or the business manager of any such person, firm, company, corporation or trust, to sell, give, deliver, or in any way directly or indirectly to any person employed by him or it, in payment of wages due or to become due, any scrip, token, check, draft, order, credit on any book of account or other evidence of indebtedness, payable to bearer or his assignee, otherwise than at the date of issue, but such wages shall be paid only in lawful money of the United States, or by check or draft drawn upon some bank in which any person, firm, company, corporation, or trust, or the agent, or the business manager of any such person, firm, company, corporation, or trust, has money upon deposit to cash the same.

" Sec. 2. All contracts to pay or accept wages in any other than lawful money, or by check or draft, as specified in section one, of this act, and any private agreement or secret understanding that wages shall be or may be paid, in other than lawful money, or by such check or draft, shall be void, and the procurement of such private agreement or secret understanding, shall be unlawful and construed as coercion on the part of the employer.

" Sec. 3. If any person shall violate any of the provisions of either section one or two of this act, or shall compel, or in any manner attempt to compel, or coerce any employee of any corporation, or trust to purchase goods, or supplies, from any particular person, firm, corporation, company or trust or at any particular store or place, he shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than one hundred dollars nor more than five hundred dollars or be imprisoned in the county jail not less than thirty or more than ninety days, or by both such fine and imprisonment for each violation.

"Sec. 4. This act shall apply only to corporations or trusts or their agents, lessees, or business managers, that employ ten or more persons.

"Sec. 5. The county attorney of any county upon complaint made to him shall proceed to prosecute the violators of this act as prescribed in other cases of misdemeanor.

"Sec. 6. That sections 2441, 2442 and 2443 of the General Statutes of Kansas, of 1889, and all acts and parts of acts in conflict with the provisions of this act are hereby repealed."

The information filed in the cause against the appellant charges, in substance, that on or about the 22d day of September, 1897, the defendant, C. L. Haun, being the agent and cashier of the Kansas Commercial Coal Company, a corporation doing business in Crawford county, Kansas, operating coal-mines, and employing more than ten persons, did unlawfully, on behalf of said coal company, give and deliver a certain order commonly called "punch-check" to one E. P. Graves, as follows:

"$2.00.          FULLER, KANSAS, 9-22-1897.

"*Kansas Commercial Coal Company :* Please accept this as my order for store merchandise to the amount of two dollars, and charge the same to my account. Not transferable.          E. P. GRAVES."

The said order was delivered to Graves for wages to become due, then and there earned by his personal labor in the coal-mines of the coal company, said Graves being employed by said company to work in and about its mines. The order, commonly called a "punch-check," was delivered to said Graves upon his personal application, made between pay-days of said coal company. On appeal to the court of appeals, the judment of conviction was affirmed. (7 Kan. App. 509, 54 Pac. 130.)

*A. A. Godard*, attorney-general, for The State.

*Morris Cliggitt*, and *Perry & Crain*, for appellant.

The opinion of the court was delivered by

SMITH, J. : In sustaining the constitutionality of the act under consideration the court of appeals held that it applied only to corporations and trusts severally employing ten or more persons ; and further, that the act is constitutional as a valid exercise of legislative authority to alter and amend corporate charters. The fact has been ignored that the complaint upon which the appellant was tried and convicted does not charge that the coal company for which he was acting was incorporated under the laws of this state. The agreed statement of facts recites merely that the Kansas Commercial Coal Company was a duly organized corporation, engaged in the business of mining coal for private gain, among other places, in Crawford county, Kansas. There is neither allegation nor proof that the corporation obtained its charter in Kansas. Nor can there be a presumption in a criminal case that it was a domestic corporation, in order to sustain a conviction. While the state might prohibit a foreign corporation from doing business here, it can hardly be claimed that it could alter or amend a corporate charter granted by the laws of another state. We will proceed, however, by assuming that the coal company was a Kansas corporation.

There is no suggestion in the title of the act that the provisions of corporate charters are to be in anywise affected. The title reads :

"An act to secure to laborers and others the payment of their wages, and prescribing a penalty for the violation of this act, and repealing section 2441, 2442

and 2443 of the General Statutes of 1889, and all acts and parts of acts in conflict herewith."

Turning to the General Statutes of 1889, we find that sections 2441, 2442 and 2443 (Gen. Stat. 1897, ch. 109, §§ 1, 2, 3), repealed, have no reference to corporate charters. The sections repealed are incorporated in the Laws of 1887, chapter 171, entitled "An act to secure to laborers in and about coal-mines and manufactories the payment of their wages at regular intervals, and in lawful money of the United States."

A person engaged in the pursuit of information regarding the extent of corporate powers under the laws of this state would receive no hint from the title of the act of 1897 that the law in question was intended for any such purpose. In the General Statutes of 1897 the act is made a part of chapter 73, under the head, "Of Labor and the Protection of Laborers," and nowhere appears classified in that part of the statute relating to corporations. This is mentioned as indicating that the compiler of the General Statutes saw nothing in the act which indicated to him that it in any wise affected the powers of corporations. The first section of the act makes it unlawful for any person, firm, company, corporation or trust to give any scrip, token, check or order to any employee. The application of this section to persons, firms, companies and trusts makes it quite clear that the general scope and purpose of the law is defined in its title, and that the alteration or amendment of corporate charters was never intended by the legislature and is not expressed in the body of the act, when the true rules of construction are applied thereto.

In the concurring opinion of Mr. Chief Justice Doster, in *Railway Co. v. Medaris*, 60 Kan. 151, 155, 55 Pac. 875, the same reasons are employed to show

that the "fellow-servant" law of 1874 could not be regarded as amendatory of corporate charters. To hold that corporate charters are affected is to set at naught section 16, article 2, of the constitution, which reads : "No bill shall contain more than one subject, which shall be clearly expressed in its title." This requirement is mandatory. (*Comm'rs of Sedgwick Co. v. Bailey*, 13 Kan. 600.) No information appearing in the title that corporate charters are affected, such subject is not only not *clearly* expressed but is not expressed at all. The object of this constitutional command is "to prevent the practice of embracing in the same bill incongruous matters having no relation to each other, or to the subject specified in the title, by which measures were often adopted without attracting attention." (Suth. Stat. Const. §§ 78–85, and cases cited ; *The State v. Barrett*, 27 Kan. 213 ; *The State v. Sholl*, 58 id. 507, 49 Pac. 668.) To satisfy the constitutional requirement the language of the act should be broad enough to show that corporate rights were either increased or abridged. In the view taken by the court of appeals, the sanction of the act is visited upon corporations and trusts employing ten or more persons, treating trusts as equivalent to corporations. Our statute defines a trust. Section 14, chapter 145, General Statutes of 1897 (Gen. Stat. 1899, § 7508), reads :

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes." (Then follow the particular acts prohibited.)

Just how the court of appeals concluded that the act we are now considering did not apply to individuals, but to trusts and corporations only, when a trust may

be composed of persons or firms associated together, we do not understand.   A trust may, or may not be, endowed with corporate powers.   If not, then it is a mere aggregation of individuals or partnerships, and could hardly be regulated under a law the constitutionality of which can be sustained only upon the ground that it alters and amends corporate charters. We are clearly of the opinion that a construction of the act which attributes to it a purpose to alter or amend corporate charters is erroneous.

We have no hesitation in saying that if this statute had, without defect as to title, clearly and in express terms amended corporate charters, retaining the section classifying corporations to which it was applicable by the number of men in their employ, it would be obnoxious to the fourteenth amendment to the constitution of the United States.

The law is partial and unequal in its operation. The first section of the act makes it "unlawful for any person, firm, company, corporation, or trust, or the agent, or the business manager of any such person, firm, company, corporation or trust," to do certain things.   Section 2 declares that "all contracts to pay or accept wages in any other than lawful money, or by check or draft, as specified in section one, of this act, and any private agreement or secret understanding that wages shall be or may be paid, in other than lawful money, or by such check or draft, shall be void."   So far the act is general, and applies to all persons and aggregations of persons alike.   In section 3 partiality commences.   Any person, says that section, who "shall compel, or in any manner attempt to compel, or coerce any employee of any corporation, or trust to purchase goods, or supplies, from any particular"  .  .  .  store or person shall be guilty of a

misdemeanor.  If, therefore, any person compels, or attempts to compel or coerce any employee, other than an employee of a corporation or trust, he is guiltless of wrong and may proceed with his compulsion without fear of prosecution.  Section 4 provides that the act "shall apply only to corporations or trusts or their agents, lessees, or business managers, that employ ten or more persons."  Not only is the attempted act of compulsion or coercion denounced in section 3 made applicable only to corporations and trusts, but the denunciation of section 4 does not touch a corporation or trust that employs less than ten men.  Thus an act of an agent, or of a corporation or trust of a given class, is unlawful, while the same act of the same man is lawful if he works for an individual, or another class of corporations or trusts.  Again, the same act of the same man would be unlawful to-day if his employer was a corporation or trust and emloyed ten men, while to-morrow it would be lawful provided in the meantime the corporation or trust had discharged one of its employees.  (*Shaver v. Pennsylvania Co.*, 71 Fed. [C. C.] 931.)

The obvious intent of the act is to protect the laborer and not to benefit the corporation.  Why should not the nine employees who work for one corporation be equally protected with the eleven engaged in the same line of employment for another corporation?  If such law is beneficial to wage-earners in the one instance, why not in the other?  The nine men lawfully paid for their labor in goods at a truck store might with much reason complain that the protection of the law was unequal as to them when they saw eleven men paid in money for the same service performed for another corporation engaged in a like business.  Such inequality destroys the law.  In the

instance cited, two of the eleven men might quit the employment of the company for which they worked and by this act alone make a method of payment by the corporation lawful which was unlawful while the eleven were employed.   The criminality or innocence of an act done ought not to depend on the happening of such a circumstance.   Equal protection of the laws means equal exemption with others of the same class from all charges and burdens of every kind. ( *In re Ah Fong*, 3 Sawy. 144, Fed. Cas. No. 102.)   In *Leeper v. Texas*, 139 U. S. 462, 468, 11 Sup. Ct. 579, 35 L. Ed. 225, it is said :

"No state can deprive particular persons, or classes of persons, of equal and impartial justice under the law;   .   .   .   due process is so secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice."

If the classification attempted by this act is a constitutional one, it follows that the legislature might have made the law applicable only to corporations employing married men or persons over a certain age, or to corporations a proportion of whose employees were women, or applied any other arbitrary or capricious means of distinction.   In the language of Mr. Justice Brewer, *infra*, "in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground,— some difference which bears a just and proper relation to the attempted classification."   A classification of the kind attempted makes a distinction between corporations identically alike in organization, capital, and all other powers and privileges conferred by law. It is arbitrary and wanting in reason.   The act in question is class legislation of the most pronounced

character.  Judge Cooley, in his Constitutional Limi-
tations (5th ed.), 484, 486, in discussing such laws,
says :

" Every one has a right to demand that he be gov-
erned by general rules, and a special statute which,
without his consent, singles his case out as one to be
regulated by a different law from that which is applied
in all similar cases, would not be legitimate legislation,
but would be such an arbitrary mandate as is not within
the province of free governments.  Those who make
the laws ' are to govern by promulgated, established
laws, not to be varied in particular cases, but to have
one rule for rich and poor, for the favorite at court
and the countryman at plow.'  This is a maxim in
constitutional law, and by it we may test the authority
and binding force of legislative enactments.

" The doubt might also arise whether a regulation
made for any one class of citizens, entirely arbitrary
in its character, and restricting their rights, privi-
leges, or legal capacities in a manner before unknown
to the law, could be sustained, notwithstanding its
generality.  Distinctions in these respects must rest
upon some reason upon which they can be defended —
like the want of capacity in infants and insane per-
sons ;  and if the legislature should undertake to pro-
vide that persons following some specified lawful
trade or employment should not have capacity to
make contracts, or to receive conveyances, or to build
such houses as others were allowed to erect, or in any
other way to make such use of their property as was
permissible to others, it can scarcely be doubted that
the act would transcend the due bounds of legislative
power, even though no express constitutional provi-
sion could be pointed out with which it would come in
conflict.  To forbid to an individual or a class the
right to the acquisition or enjoyment of property in
such manner as should be permitted to the community
at large, would be to deprive them of liberty in par-
ticulars of primary importance to their ' pursuit of
happiness ' ; and those who should claim a right to
do so ought to be able to show a specific authority

therefor, instead of calling upon others to show how and where the authority is negatived."

Such legislation is violative of the fourteenth amendment of the constitution of the United States, which provides: . . . "Nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Corporations are regarded as persons within the meaning of said amendment. (*Santa Clara Co. v. South. Pac. Railroad*, 118 U. S. 394, 6 Sup. Ct. 1132, 30 L. Ed. 118 ; *Pembina Mining Co. v. Pennsylvania*, 125 U. S. 181, 8 Sup. Ct. 737, 31 L. Ed. 650.) The equal protection mentioned by the enforcement of this statute is denied by making one of two men engaged in the same business, under precisely similar circumstances, in the same town or building, a criminal, and imposing no penalty whatever upon the other for the same act, the only difference being that one worked for a copartnership and the other for a corporation.

In the late case of *Gulf, Colo. & Santa Fe Ry. v. Ellis*, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, the supreme court of the United States passed on a statute of Texas which provided that any person having a *bona fide* claim for services, labor, damages, overcharges on freight, or for stock killed or injured by any railway company, not exceeding fifty dollars, might present the same, verified by affidavit, for payment to such corporation by filing it with the station agent ; and if at the expiration of thirty days such claim was not paid he might immediately institute suit thereon, and if he should obtain judgment he should be entitled to recover the amount of the claim and all costs, and in addition thereto a reasonable attorney's fee, not to exceed ten dollars. It was held that the statute

The State v. Haun.

deprived the railway companies of property without due process of law, and denied to them its equal protection, in that they were singled out of all citizens and corporations and required to pay in certain cases attorneys' fees to the parties successfully suing them, while it gave to them no corresponding benefit. A large number of decisions bearing upon the question are collected in this opinion. Mr. Justice Brewer, in deciding the case, among other things, said:

"If it be said that this penalty is cast only upon corporations, that to them special privileges are granted, and therefore upon them special burdens may be imposed, it is a sufficient answer to say that the penalty is not imposed upon all corporations. The burden does not go with the privilege. Only railroads of all corporations are selected to bear this penalty. The rule of equity is ignored. . . . But a mere statute to compel the payment of indebtedness does not come within the scope of police regulations. The hazardous business of railroading carries with it no special necessity for the prompt payment of debts. That is a duty resting upon all debtors, and while in certain cases there may be a peculiar obligation which may be enforced by penalties, yet nothing of that kind springs from the mere work of railroad transportation. . . . But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the fourteenth amendment forbids this. . . . It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground — some difference which bears a just and proper relation to the attempted classification."

In the case of *State v. Goodwill*, 33 W. Va. 179, 182, 10 S. E. 286, 6 L. R. A. 623, a statute prohibiting any person, firm, company, corporation or association

engaged in mining or manufacturing from using in payment for labor any order or other paper, unless redeemable for its face value in lawful money of the United States, was held to be void.    The court said:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by restricting the privleges of certain classes of citizens and not all others, when there is no public necessity for such discrimination, is unconstitutional and void.    Were it otherwise, odious individuals or corporate bodies would be governed by one law, and the mass of the community, and those who make the law, by another."

Again, in *Frorer et al. v. The People*, 141 Ill. 171, 180, 31 N. E. 397, 16 L. R. A. 495, the court, in passing on a scrip law similar to the one in question, said:

"If the general assembly may thus deprive some persons of substantial privileges allowed to other persons under precisely the same conditions, it is manifest that it may, upon like principle, deprive still other persons of other privileges in contracting, which, under precisely the same circumstances, are enjoyed by all but the prohibited class.    And it can hardly be admissible that the legislative determination that the facts are such as to warrant this discrimination is conclusive, . . . since, if that were so there could be nothing but its own discretion to control its action in regard to every liberty enjoyed by the citizen; and it might find that the public welfare required that society should be divided into an indefinite number of classes, each possessing or being denied privileges in contracting and acquiring property, as favoritism or caprice might dictate."

However much the employed might profit by the necessities of the employer desiring to exchange prop-

erty for labor at a value advantageous to the former, all such beneficial agreements are prohibited by this law. In short, such legislation infringes upon natural rights and constitutional grants of liberty. It treats the laborer as a ward of the government, and discourages the employment of those talents which lead to success in the fields of commercial enterprise. Persons *sui juris* need no guardians. Those who seek to put a protector over labor reflect upon the dignity and independence of the wage-earner, and deceive him by the promise that legislation can cure all the ills of which he may complain. Such legislation suggests the handiwork of the politician, rather than of the political economist.

In the case of *The State v. Loomis*, 115 Mo. 307, 315, 22 S. W. 350, 21 L. R. A. 789, Mr. Chief Justice Black, in an able opinion, held a scrip law substantially like the statute under consideration to be void as an unwarranted interference with the liberty of the citizen. The Missouri statute provided that it should be unlawful for any corporation, person or firm engaged in manufacturing or mining to issue or circulate for payment of the wages of labor any order, check or memorandum, payable otherwise than in lawful money of the United States, unless the same was negotiable, and redeemable at its face value without discount, in cash or in goods, at the option of the holder, at the store or other place of business of such firm, person, or corporation. Referring to such statutes, the learned justice said :

" They single out those persons who are engaged in carrying on the pursuits of mining and manufacturing, and say to such persons, you cannot contract for labor payable alone in goods, wares and merchandise. The farmer, the merchant, the builder and the numerous contractors employing thousands of men may

make such contracts, but you cannot.  They say to the mining and manufacturing employees, though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone as others may.

" It will not do to say these sections simply regulate payment of wages, for that is not their purpose.  They undertake to deny to the persons engaged in the two designated pursuits the right to make and enforce the most ordinary every-day contracts — a right accorded to all other persons.  This denial of the right to contract is based upon a classification which is purely arbitrary, because the ground of the classification has no relation whatever to the natural capacity of persons to contract.

" Now it may be that instances of oppression have occurred and will occur on the part of some mine owners and manufacturers, but do they not occur quite as frequently in other fields of labor?   Conceding that such instances may and do occur, still that furnishes no reasonable basis for depriving all persons engaged in the two lawful and necessary pursuits of the right to make and enforce every-day contracts.

" Liberty, as we have seen, includes the right to contract as others may ; and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the constitution undertakes to secure to every citizen.   Applying the principles of constitutional law before stated, we can come to no other conclusion than this, that these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government.   If they can stand, it is difficult to see an end to such legislation, and the government becomes one of special privileges, instead of a compact ' to promote the general welfare of the people.'   We place our conclusion on the broad ground that these sections of the statutes are not 'due process of law' within the meaning of the constitution."

To the same effect see *Ritchie v. The People*, 155 Ill.

98, 40 N. E. 454, 29 L. R. A. 79; *Godcharles & Co. v. Wigeman*, 113 Pa. St. 431, 437, 6 Atl. 354. The latter case was an action brought by Wigeman to recover wages as a puddler. A plea of payment was made. During the time of his employment the plaintiff asked for, and received, orders from defendants on different persons for coal and other articles, which orders were honored by the persons on whom drawn, and the defendants paid them. An act of the legislature made all orders given to their workmen by employers engaged in the business of manufacturing, payable in goods or anything but money, void. Speaking of these sections of the act, the court said :

" They are utterly unconstitutional and void, inasmuch as by them an attempt has been made by the legislature to do what, in this country, cannot be done ; that is, prevent persons who are *sui juris* from making their own contracts. The act is an infringement alike of the right of the employer and the employee. . . . He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges, and consequently vicious and void."

See also *Low v. Rees Printing Co.*, 41 Neb. 127, 59 N. W. 362, 24 L. R. A. 702 ; *Millett v. The People*, 117 Ill. 294, 7 N. E. 631 ; *Braceville Coal Co. v. The People*, 147 Ill. 66, 35 N. E. 62 ; *Pearson v. City of Portland*, 69 Me. 278 ; *In re House Bill No. 203*, 21 Colo. 27, 39 Pac. 431 ; *In re Eight-hour Bill*, 21 id. 29, 39 Pac. 328 ; *Colon v. Lisk*, 153 N. Y. 188, 47 N. E. 302 ; *State v. Julow*, 129 Mo. 163, 31 S. W. 781 ; *People ex rel. Tyroler, v. Warden of Prison*, 157 N. Y. 116, 51 N. E. 1006 ; *Matter of Application of Jacobs*, 98 N. Y. 98.

Under the penal provisions of the statute in ques-

11—61 KAN.

tion, a laboror who works for a corporation or trust employing ten or more persons is deprived of his freedom of contract, in that he cannot bargain to receive anything in payment for his labor but lawful money of the United States. 'While it might be desirable and profitable to the employee of such corporation to receive a horse, or a cow, or a house and lot in payment for his wages, yet the legislature prohibits payment in that way, and places the laborer under guardianship, classifying him in respect to freedom of contract with the idiot, the lunatic, or the felon in the penitentiary. It has been sought by some judges to justify legislation of this kind upon the theory that, in the exercise of police power, a limitation necessary for the protection of one class of persons against the persecution of another class may be placed upon freedom of contract. As between persons *sui juris*, what right has the legislature to assume that one class has the need of protection against another? In this country the employee to-day may be the employer next year, and laws treating employees as subjects for such protective legislation belittle their intelligence and reflect upon their standing as free citizens.

It is our boast that no class distinctions exist in this country. An interference by the legislature with the freedom of the citizen in making contracts, denying to a part of the people, possessing sound minds and memory, the right to bargain concerning the equivalent they may desire to receive as compensation for their labor, is to create or carve out a class from the body of the people and place that class within the pale of protective laws which invidiously distinguish them from other free citizens, thus dividing by arbitrary fiat equally free and intelligent people into distinctive classes or grades — the one marked by law as the object of legislative solicitude, the other not.

This discrimination has been justified by writers defending the doctrine of paternalism, and by some judges, upon the asserted fact that labor is constantly engaged in an unequal contest with capital, and that the former must be reinforced by the legislative power of the state to prevent its overthrow in the conflict. Freedom of action — liberty — is the corner-stone of our governmental fabric. Laws which infringe upon the free exercise of the right of a working man to trade his labor for any commodity or species of property which he may see fit and which he may consider to be the most advantageous, is an encroachment upon his constitutional rights and an obstruction to his pursuit of happiness. Such laws as the one under consideration classify him among the incompetents and degrade his calling. The proportion of lawful money in circulation is small compared with the value of other property in the United States. Accumulated wealth, much or little, is represented in a very small part by money. To say that a free citizen can contract for, or agree to receive in return for his labor, one kind of property only, and that which represents the smallest part of the aggregate wealth of the country, is a clear restriction of the right to bargain and trade, a suppression of individual effort, a denial of inalienable rights.

In Tiedeman on Limitations of the Police Power, section 178, the author says :

"Laws, therefore, which are designed to regulate the terms of hiring in strictly private employments, are unconstitutional, because they operate as an interference with one's natural liberty, in a case in which there is no trespass upon private right, and no threatening injury to the public. And this conclusion not only applies to laws regulating the rate of wages of private workmen, but also any other law, whose ob-

The State v. Haun.

ject is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference by the state in the private relation of master and servant except for the purpose of preventing frauds and trespasses."

It will be noted that in the case at bar the appellant did not urge or compel the employee, Graves, to take the order for merchandise. Graves voluntarily applied for and requested that the same be given to him between pay-days. Had he been content to have waited until the regular pay-day he would have received his wages in money. It was his option to take the order, and for compliance with his request the appellant was convicted. Here was no force or compulsion on the part of the appellant, and he committed no fraud or trespass. We conclude, therefore : (1) That chapter 145, Laws of 1897 ( Gen. Stat. 1897, ch. 73, §§ 22–26), is not to be construed as altering or amending corporate charters ; (2) that it is in violation of the fourteenth amendment of the constitution of the United States,.in that it denies to persons within this state the equal protection of the laws.

The judgment of the court of appeals and of the district court is reversed and the appellant discharged.

JOHNSTON, J., concurring.

DOSTER, C. J. (dissenting) : I dissent from the decision of this case. Appellant is an employee of a corporation. Therefore, the legislature may rightfully control his action to the extent that it can control the action of the corporation whose agent he is. Inasmuch as a corporation can only act by agents, the law must in consequence visit upon the latter such penalties as will insure compliance with the requirements imposed upon the former. The corporation repres-

ented by the appellant is a voluntary association of individuals who sought and obtained the special privilege under the statutes of this state of acting together as an ideal, intangible entity in the business of mining for coal. They might have prosecuted their enterprise as individuals or in conjunction with one another as partners. They did not choose to do so, but on the contrary preferred to avail themselves of the greater rights and advantages known or supposed to belong to a corporate organization. This they had the right to do, but they could only do so by virtue of the special permission and subject to the special conditions of the constitution and statutes of the state. The chief of these conditions is the reserved power of the legislature to alter or amend the laws pertaining to their organization and methods of transacting business. The constitution of the state ordains: "No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency." (Bill of Rights, § 2.)  " Corporations may be created under general laws; but all such laws may be amended or repealed." (Art. 12, § 1.)

Questions as to the extent of the power reserved in constitutional or statutory provisions similar to those above quoted have been frequently raised. The result of the various decisions on the subject is thus summarized in 7 A. & E. Encycl. of L., 2d ed., 675: "It may be safely stated, however, that the legislature has authority to make any alteration or amendment in a charter granted subject to such reserve power, which will not defeat or substantially impair the object of the grant or rights vested under it, and which it may deem proper to secure either that object

or other public or private rights." The supreme court of the United States has repeatedly affirmed the efficacy of the power to amend corporate charters within the limitations above stated, when expressly reserved, as in our constitution. (*N. Y. & N. E. Railroad Co. v. Bristol*, 151 U. S. 556, 14 Sup. Ct. 437, 38 L. Ed. 269.)

Counsel for appellant do not question the soundness of the doctrine as an abstract proposition of law, nor do they question its application to the case under discussion except to inveigh against it through mere generalities and platitudes, as that "vested rights cannot be destroyed or impaired under such reserved power," and "the exercise of the reserved power must not defeat or substantially impair the object of the grant." The assertion of these truisms, however, is nothing more than a restatement of the rule of law in the very terms of its admitted limitations. The reserved power to amend corporate charters is not, of course, the power to destroy vested rights, or to defeat the object of the grant; but to assert that a statutory amendment to a charter imposing upon the corporation the obligation to pay the wages of its employees in current money instead of orders for goods, and invalidating prospectively all contracts to pay other than in money, impaired the object of the grant to the corporation, or any vested right held by it, would be to impeach the intelligence of the court addressed. Indeed, such a statute does but give express force to the implied agreement contained in every contract solvable in money that it shall be so discharged; and it does but aid in the execution of the sovereign power of the nation to provide and maintain a standard of value and a medium of exchange. These considerations, as bases upon which to rest legislation of

the kind in question, were stated and elucidated by the supreme court of Indiana in *Hancock et al. v. Yaden*, 121 Ind. 366, 23 N. E. 253, 6 L. R. A. 576, with a strength and cogency of reasoning which, so far as I know, has never even been assailed. If, therefore, the act under consideration is in the nature of an amendment to the statutes providing for the organization of corporations and prescribing regulations for the transaction of their business, it is beyond attack from any of the constitutional grounds assumed by the counsel for appellant. Hence, the meritorious question in the case is not whether the Kansas legislature has the power to impose upon a Kansas corporation the obligation to pay its employees in money, but whether it has actually done so.

It is a fundamental rule of judicial action to resolve all reasonable doubts as to the constitutional validity of a legislative enactment in favor of the statute. Indeed, the perception of a reasonable doubt as to whether the enactment is constitutionally valid is to determine the question in favor of the act. This has been declared so often by this and other courts, and is so well understood as an elementary principle, that reference to the decisions would encumber, not fortify, an opinion. I need go, therefore, no further than to show that a reasonable doubt exists as to whether the act under discussion violates the organic law. I do not have to demonstrate its constitutional validity.

The argument of my associates is based upon two propositions, the first of which is that neither the title of the act nor the act itself purports to be in amendment of corporate charters, and, therefore, its enactment was not in execution of the constitutionally reserved power of amendment. The supposed defect more specifically pointed out by them is in the title

of the act.   They say that "no information appear
ing in the title that corporate charters are affecte,
such subject is not only not *clearly* expressed, but is
not expressed at all"; and hence, as they say, the
statute is repugnant to the constitutional requirement
that the subject of an act shall be clearly expressed
in its title.   This, indeed, is refining to a most filmy
and tenuous degree.   If in *fact* an act amends the
statutes relating to corporate organization, or meth-
ods, or powers, it need not name itself as an amend-
atory act.   It is sufficient if it contain provisions
regulative of corporation methods or in enlargement
or restriction of corporate powers.   The subject-
matter of such act does not exist in the assertion of
its amendatory character, but it exists in the substan-
tive provision newly inserted in place of, or supple-
mental to, the old one.   If this substantive provision
is clearly expressed in the title of the act, the act is
valid, whether or not it, in its title, purports to be
in amendment of the corporate charter.   It becomes
an amendment by force of the fact that it relates
to the powers, or is regulative of the methods of,
the corporation.   It does not derive its validity and
binding force from the fact (if such should be the
case) that it declares itself to be amendatory, but it
derives it from the fact that such is its nature and
effect.   This proposition is so reasonable, so nearly
self-evident, that it has been challenged, I think, but
once before.   That was in *Timm v. Harrison*, 109 Ill.
593.   I quote from the opinion in that case :

"It is insisted that the act of June 15, 1883, is
in effect an amendment of chapter 43 of the Revised
Statutes of 1874, known as the 'dram-shop act,' and
that it violates the provision of section 13, article 4, of
the constitution of 1870, that 'no act hereafter passed
shall embrace more than one subject, and that shall

be expressed in the title,' in that the title of the act
does not profess to make such amendment. It is said
that, if an existing law is amended, the fact that the
new act is in amendment of the prior law must be ex-
pressed in the title of the new act, because such fact
is the 'subject' of the new law. The subject-matter of
each of the three sections of the act of June 15 is em-
braced in the title. If such subject-matter operates
to amend or to repeal any prior law, that will be but
the effect of the subject-matter; and it is only the
subject which the constitutional provision requires to
be expressed in the title, and not the effect thereof.
This precise question we regard as determined by the
decision in *The People v. Wright*, 70 Ill. 388. The court
there say of the act which they were called upon to
construe: 'Although that act does not, in terms, profess
to be an amendment of the charter of the city of Chi-
cago, it is manifest that such was its necessary effect.
It is entitled "An act to establish a board of police in
and for the city of Chicago, and to prescribe their
powers and duties." It requires the organization of an
executive department of the municipal government of
the city, to be known as the "board of police of the
city of Chicago," and to this board it transfers the con-
trol and management of the entire police of the city,
and also of all public police property. Certain powers
theretofore exercised by the mayor and common council
are thereafter to be exercised by the board of police.
It (the act) became fundamental — a part of the or-
ganic law of the municipality — in other words, an
amendment of its charter; and the mere fact that the
act in its title does not profess to amend the city char-
ter is unimportant. It professes to, and does, enact
that which makes new organic law for the city govern-
ment, and this is sufficient.'"

The doctrine of the majority of the court, reduced
to a finality, is that no act affecting corporations later
than the original one is valid unless in its title it pur-
ports to be amendatory of the existing law; that is to
say, carried to its logical extent, that corporations are

not required to take notice of the general body of the statute law, but only of such portions of it as specifically relate to them and declare such relationship in their titles. The individual citizen, however, continues to be charged with a knowledge of the law, whether he in fact possesses it or not.

I do not put my brethren in a false position by this statement and illustration. I but unmask the position they already occupy. Take the statute under consideration for an instance. It purports in its title to be an act to secure to laborers the payment of their wages, etc. Now, all classes of persons and associations employ laborers and become indebted to them for wages; corporations do; trusts do; partnerships do; individuals do; so likewise the managers and agents of corporations, trusts, partnerships, and individuals. Admit this statute to be constitutional as against every objection save the one under consideration (and the fact of its being unconstitutional upon other grounds does not deprive the illustration of its pertinence), and the resulting law, as my associates would have it, is that every one of the above-named classes of persons and associations, save corporations, are required to take notice of it and be governed by its provisions. Every employer of labor, except a corporation employer, must obey its requirements, or, if not, abide its penalties. This exemption of the corporation from the common obligation to know the law and obey its mandate is placed on the sole ground that the statute does not profess in its title to be amendatory of the original charter of incorporation.

Corporations employ laborers and are under obligation to pay them, and it is within the admitted power of the legislature to secure by appropriate enactment the payment of wages due from corporations as well

The State v. Haun.

as from other classes of employers ; but, nevertheless, an act which by its title professes generally to secure wages to laborers from all classes of employers does not secure them from corporations because it does not in its title specifically purport to do so.   This is the very madness of unreason.   It not only leads to the conclusion, but is itself the conclusion, that not a single act concerning corporations passed subsequently to the original one is of any validity, unless the subject of corporations is indicated or comprehended in its title.   This court has never heretofore decided cases affecting corporations upon any such assumption.   On the contrary, the companion case to this, *The State v. Wilson*, ante, p. 32, which was submitted along with this one, and just decided, was determined upon the exactly opposite theory.   The act under consideration in that case was entitled "An act to regulate the weighing of coal at the mine."   It did not in its body, any more than in its title, profess to apply to corporations ; nevertheless two of us held it to apply to a corporation, and Mr. Justice Smith, who dissented, did not rest his objections to the act upon the ground that the subject of corporations was not expressed in the title.

I know the answer to the argument I have thus advanced.   It is not expressed, or perhaps even implied, in the opinion of the majority ; but it is the only one which can be made with sufficient show of reason to command a moment's attention.   It is that statutes may be regulative of the business in which corporations, as well as individuals, engage, and that such a statute, applying rather to the business prosecuted than the power to prosecute it, is not to be held amendatory of the charters of corporations engaging in it; and hence the statute we are considering, dic-

tating, as it does, the payment in money of wages due from natural persons as well as from corporations, assumes to regulate a business common to all, not a right of the corporations concerned. In this way my learned associates reach the conclusion, first, that the statute is not amendatory; and second, that, not being amendatory, it is an unjustifiable restriction upon the constitutional freedom of contract. With the first of these conclusions only do I have any present concern. That conclusion is the conception of a distinction without a difference, and is appreciable only by one who is capable of understanding how a statute may regulate the business of a corporation without at the same time regulating the corporation itself. It is a fiction pure and simple. Although not expressed in the words here employed, hardly expressed at all, in the cases of *Union Trust Co. v. Thomason*, 25 Kan. 1; *Rouse v. Harry*, 55 id. 589, 40 Pac. 1007; *Railway Co. v. Medaris*, 60 id. 151, 55 Pac. 875, it nevertheless was made to serve in part, at least, as a basis for the decision of those cases. Without raising the question of the correctness of those decisions from other standpoints and for other reasons, I repudiate the idea that the business of a corporation may be regulated without also regulating the corporation itself in the exercise of its corporate rights or methods.

Take again, for illustration, the statute under discussion. In order to test the reasonableness of the theory of regulating the business without regulating the owner of it, assume the statute to be constitutionally unobjectionable. Before its enactment corporations possessed the right to pay their employees in any medium that might be agreed upon. This was a right necessarily implied in their charters, because, unless otherwise restricted, corporations may do busi-

ness exactly the same as natural persons. The statute took away this charter right and commanded payment to be made in money. Now, I ask, is this a regulation of the business in which corporations are engaged, or is it a regulation of the corporations themselves? Does it relate solely to the business which natural persons together with corporations are prosecuting, or does it impose a substantive limitation on the charter powers of corporations? Whatever court should hold in express terms that it relates to the business of the corporation and not to the corporation itself (and those are the ultimate terms to which such decision would reduce itself) would be regarded as having perpetrated a judicial jest rather than a judicial decision.

The objection that the act under consideration does not itself profess to be amendatory of the existing law is of a piece with the objection to the title. If the act is in fact amendatory, if it adds anything to the body of the law on the subject, it must of necessity be regarded, legally speaking, as amendatory.

It is also said that this act cannot be regarded as amendatory of the corporation laws because it contains provisions applicable to others than corporations, and hence it could not have been the legislative intent to give it the character of an amendment to corporate charters. This is but a statement in another form of the objections already noticed and answered. It will be observed that the body of the act does apply to corporations *eo nomine*. It is evident, therefore, that the legislature designed that corporations should be affected by the act; that they, as well as individuals and other classes of associations, should be laid under the obligation to pay their employees in money. This, I repeat again, makes the act as to corporations

amendatory in nature. The design to produce the effect, the purpose to impose new restrictions on corporate powers, is the intent to amend. It may be incongruous to join natural persons with artificial ones in a statute such as this, which as to the artificial ones can only operate as an amendment to the code already governing them; but if it be done, the natural, the necessary, effect of the new law, as an amendment of the old one, is not thereby prevented.

I come now to consider the last of the two propositions on which my associates rest their judgment that the statute is not an amendment of corporate charters. It is not advanced by them in that portion of their opinion devoted to the specific topic. It is clearly indicated, however, as a substantive objection in their discussion of the invalidity of the act as a police regulation and its consequent repugnance to the fourteenth amendment to the federal constitution. It is that the act being, as they endeavor to show, invalid as to natural persons and associations of natural persons, it is likewise invalid as to the corporations which, along with the others, are included in its terms. I grant that a part of an act violative of the fundamental law nullifies the entire statute, if the bad cannot be separated from the good; this is familiar law; but, assuming the objection to the portions of the act we are considering to be well founded, I deny that such portions cannot be separated from those which otherwise would be good. The rule upon the subject is thus stated by an eminent jurist and law-writer:

" Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning, that

it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section ; for the distribution into sections is purely artificial ; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained." (Cooley's Const. Lim., 5th ed., 212.)

The provisions of the statute under consideration as to natural persons and associations of natural persons are not so "connected in subject-matter" with the similar ones relating to corporations that if one falls the others must likewise fall. Those concerning the one class are not so dependent as that on those of the other class. They do not all "operate together for the same purpose," nor are they all "so connected together in meaning" that it cannot be presumed that the legislature would not have passed the one provision without the other. The provisions of the statute concerning the several classes of persons are not "essentially and inseparably connected in substance." The legislature desired to secure to laborers generally the payment of their wages in money. It had the undoubted right thus to secure the wages of corporation employees. It conceived, wrongly we will assume, that it also had the right likewise to secure the wages of employees of others than corporations, and it undertook so to do. Can it, with any reason, be said that it would not have exercised its constitutional power over corporations in the respect

named because it could not exercise a similar power over other employers of labor? or, to ask the question in the only terms which I am required to employ, Is it not reasonable to doubt that it would abnegate its power over the one class because it could not exercise it over the others? The asking of the question, as it seems to me, carries with it an affirmative answer.

We are not, however, without authority on the precise question. In *Leep v. Railway Company*, 58 Ark. 407, 25 S. W. 75, 23 L. R. A. 264, the constitutional validity of a statute which laid certain obligations on railroad companies and individual persons was considered. The court held the act invalid as to the individuals but valid as to the corporations, declaring that, " if in a statute as to contracts with employees unconstitutional provisions as to natural persons are inserted, they may be eliminated where the remainder of the statute relates to corporations and is valid." This case is identical, so far as concerns our particular question, with the one under discussion. It declares the true rule, and, so far as I know, there is not a single opposing authority, but on the contrary there are many which support it. (*Tiernan v. Rinker*, 102 U. S. 123, 26 L. Ed. 103 ; *State v. Amery*, 12 R. I. 64 ; *Moore v. New Orleans et al.*, 32 La. Ann. 726.)

Stress is laid on the fact that the act under consideration applies only to corporations and others employing ten or more men, and it is held by the majority that, admitting it to be an amendment of corporate charters, it nevertheless, in the respect mentioned, unreasonably discriminates between classes of corporations, and is consequently invalid. Much of the argument made and nearly all of the illustrations used to picture the claimed inequalities of the law are from the standpoint of the laborer himself. It is said :

" The obvious intent of the act is to protect the

laborer and not to benefit the corporation. Why should not the nine employees who work for one corporation be equally protected with the eleven engaged in the same line of employment for another corporation? The nine men lawfully paid for their labor in goods at a truck store would, with much reason, complain that the protection of the law was unequal as to them, when they saw eleven men paid in money for the same service performed for another corporation engaged in a like business. Such inequality destroys the law," etc.

I deny that the act is to be viewed in such respect from the standpoint of the employee. The corporations cannot be heard to say, as a legal objection to the act, that its operation produces, as an incidental consequence, discrimination among their laborers. They cannot be allowed to put themselves in the position of the laborer, and say, as though with his mouth, " The law does not compel my employer to pay me in current money but does compel my neighbor's employer to pay him in such medium. It is therefore bad." To make the law a bad one, unjust discrimination must be made between the corporations themselves, so that some of them can say in their own behalf, " This law withholds privileges from me which it accords to others. It is therefore bad." Suppose the law produced none of the claimed inequalities as to corporations, but as to their employees produced all that have been so indignantly denounced by my associate, Mr. Justice Smith, would any of the corporations be heard to say that the law was bad, not because of its effect on them, but because of its effect on their workmen? The simple asking of the question is enough.

So far as concerns the charge of discrimination between the corporations themselves, viewed in respect

12—61 KAN.

to the power of the legislature to amend their charters (and the power to discriminate has to be viewed in connection with the power to amend), we may, I think, reach an accurate conclusion by asking whether the legislature could have made the discrimination in the original act providing for the organization and prescribing the powers of corporations. Whatever could have been done in the first instance can yet be done, save that vested rights acquired under the license to be a corporation cannot now be impaired; nor (what is the same thing) can the right to pursue the purpose or object of the grant be substantially impaired save by repeal. Subject to the limitations stated, the legislature may now do anything which it originally might have done. In the face of this obvious legal truth, it would be a waste of effort to try to prove that a distinction can now be made between corporations employing ten men and those employing more. Whoever denies that it can now be made is driven by the logic of his position to deny that the legislature, the creator of corporations, could have drawn the distinction in the first place. But we are not without authority upon this precise point. In the case of *The State v. Peel Splint Coal Co.*, 36 W. Va. 802, 831, 15 S. E. 1000, an act to provide for the screening of coal by the operators of coal-mines employing more than ten men was upheld as against the same charge of discrimination that is here urged; and in *Shaffer & Munn v. Union Mining Co.*, 55 Md. 74, an act similar to the one we are now considering, requiring coal-mining companies employing more than ten men to pay their laborers in money, was also upheld as against the same charge of discrimination. The supreme court of the United States has likewise committed itself to the same doctrine. In the case of

*Budd v. New York*, 143 U. S. 517, 12 Sup. Ct. 468, an act of the legislature of that state fixing the maximum charges of grain elevators in cities of 130,000 population or more, but exempting elevator owners in cities of less population, was attacked on the score of unjust discrimination violative of the fourteenth amendment to the federal constitution. The act, however, was sustained, the court ruling its validity in the following language : "Although the act of New York did not apply to places having less than 130,000 population, it did not deprive persons owning elevators in places of 130,000 population or more of the equal protection of the laws."

In this case the right of the legislature to regulate the charges of grain elevators was rested, as it had been in former cases, upon the public character of such agencies ; but the right to discriminate between them, a right apart from the right of regulation, was not placed upon the ground of their public character but upon the ground that the act operated equally upon all the elevator owners within each of the two classes into which elevators had been divided. Classification or discrimination in such respect is allowable, within the rule of equality thus declared. The supreme court of Iowa well expressed the theory of legislative right to discriminate between classes of persons. It said : " The number of citizens affected by a law does not control its validity under . . . the constitution. If the law operates upon every person within the relations or circumstances provided for, it is sufficient as to uniformity." (*McAunich v. The Mississippi & Missouri Railroad Co.*, 20 Iowa, 338.)

Reference is made in the majority opinion to my concurrence in the decision of *Railway Co. v. Medaris*, 60 Kan. 155, 55 Pac. 875. I concurred in that case,

but, as distinctly stated, "only upon the assumption that the 'fellow-servant' act of 1874 was not an amendment of the general railroad incorporation law." After stating the contentions of those who did not regard the act as amendatory, I said : "The questions herein suggested were not discussed before us, and as to what should be the proper view to be taken of them I have no matured judgment. However, I yield formal assent to the decision made, but without feeling myself bound by it as in other and ordinary cases." I have no wish to deprive my brethren of whatever weight the above expression of opinion may possess.

The majority of the court, after first conceiving the act under consideration to be without the license contained in the reserved power of the constitution to amend corporate charters, proceed to dispose of its remaining claim to validity as an exercise of the police power of the state. Believing it to be amendatory in character, and therefore valid, irrespective of its nature as a police regulation, there is no occasion, therefore, for me to express an opinion upon the latter subject, nor upon the corollary subject of its conflict with the fourteenth amendment to the federal constitution, further than I have done in showing that it does not unlawfully discriminate between classes, and consequently does not withhold from any of them the equal protection of the laws.