## RUMBO v. WINTERROWD.   (No. 8406.)

(Court of Civil Appeals of Texas.   Dallas. Feb. 5, 1921.)

1. **Constitutional law** &#8660;46(1) — **Decision on question of constitutionality avoided if possible.**

The question of the constitutionality of a statute will not be passed upon if the rights of the litigants can otherwise properly be adjudicated.

2. **Constitutional law** &#8660;26, 70(3) — **Legislature limited only by Constitution.**

The Legislature is omnipotent in all instances except where a limitation set upon its powers appears embedded in the Constitution, either from express inhibitions written there or from clear and conclusive implication, and its acts cannot be questioned by courts merely because judges consider them unwise, improvident, oppressive, or otherwise unsound, if a constitutional restriction, which they transcend and override, cannot be definitely indicated.

3. **Constitutional law** &#8660;81—**"Police power" defined.**

Police power is that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the state necessary for the public welfare.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Police Power.]

4. **Constitutional law** &#8660;298(1)—**Landlord and tenant** &#8660;320—**Prohibiting landlord from taking more than one-third of crop as rent violates due process.**

Rev. St. 1911, art. 5475, as amended in 1915 (Acts 34th Leg. c. 38 [Vernon's Ann. Civ. St. Supp. 1918, art. 5475]), providing that a letting of farm lands giving to the landlord more than one-third of crops shall be void, violates the due process clauses of the state and federal Constitutions (Const. Tex. art. 1, § 19; Const. U. S. Amend. 14, § 1).

Appeal from District Court, Ellis County; F. L. Hawkins, Judge.

Action by C. W. Winterrowd against G. A. Rumbo. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

W. H. Brown, of Dallas, and Supple & Harding, of Waxahachie, for appellant.

W. A. Johnson, of Ennis, for appellee.

---

&#8660;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

HAMILTON, J. Appellant owned 178 acres of agricultural land in Ellis county, Tex., which he rented to appellee for the year 1918. The farm was highly improved. The principal residence on it was of unusual value. It was large and commodious and attractively built and finished. It was equipped with electric lights, bath, and other modern conveniences and comforts. It was located in a most desirable community. The roads were good and the market easily accessible. The land was very productive, and a well-equipped school with the best facilities stood near the premises. The rental contract was that appellee should pay as rental the third of the grain and the fourth of the cotton raised on the land that year, and also $356, or $2 per acre, in addition to said third of grain and fourth of cotton. The contract was executed by appellee according to all its provisions, and, after having paid all the rent agreed upon, including the shares of the grain and cotton paid as they were gathered, and the $356 cash, paid in January, 1918, appellee instituted suit to recover $712, double the rent paid in excess of the third of the grain and fourth of the cotton raised during 1918. The case was tried in the district court of Ellis county on the 23d day of September, 1919, and the trial resulted in a judgment for appellee in the sum sued for, $712.

The right of recovery asserted, and upon which the judgment appealed from rests, exists exclusively and only by reason of the provisions contained in article 5475, Rev. Civ. Stats., which creates a preference landlord's lien, fixes the maximum rent for agricultural land, declares all rent contracts fixing a higher or greater rental null and void, and provides for recovery by the tenant of double the full amount of such rent or money so received or collected. Formerly, this article merely provided for the landlord's preference lien to secure payment of rents, and for provisions, supplies, money, etc., supplied by the landlord to the tenant for any current year. But in 1915 (Acts 34th Leg. c. 38 [Vernon's Ann. Civ. St. Supp. 1918, art. 5475]) the Legislature of Texas amended the article by adding thereto the following provisions:

"Provided, however, this article shall not apply in any way nor in any case where any person leases or rents lands or tenements at will or for a term of years for agricultural purposes where the same is cultivated by the tenant who furnishes everything except the land, and where the landlord charges a rental of more than one-third of the value of the grain and more than one-fourth of the value of the cotton raised on said land; nor where the landlord furnishes everything except the labor and the tenant furnishes the labor and the landlord directly or indirectly charges a rental of more than one-half of the value of the grain and more than one-half of the value of the cotton raised on said land, and any contract for the leasing or renting of land or tenements at will or for a term of years for agricultural purposes stipulating or fixing a higher or greater rental than that herein provided for, shall be null and void, and shall not be enforceable in any court in this state by an action either at law or in equity and no lien of any kind, either contractual or statutory, shall attach in favor of the landlord, his estate or assigns, upon any of the property named, nor for the purpose mentioned in this article; and provided, further, that if any landlord or any person for him shall violate or attempt to evade any of the provisions of this article by collecting or receiving a greater amount of rent for such land than herein provided, shall be collected or received by him upon any contract, either written or verbal, the tenant or person paying the same, or the legal representatives thereof, may, by an action of debt instituted in any court of this state, having jurisdiction thereof, in the county of the defendant's residence or in the county where such rents or money may have been received or collected, or where said contract may have been entered into, or where the party or parties paying the same resided when such contract was made, within two years after such payment, recover from the person, firm or corporation receiving the same, double the full amount of such rent or money so received or collected. All laws and parts of laws in conflict with this article are hereby expressly repealed."

Appellant challenges the 1915 amendment made by the Legislature, and asserts that it is absolutely void and in contravention of the Bill of Rights embodied in the state Constitution, and violative of the Constitution of the United States. He specifically designates those portions of each of these instruments to which the enactment he attacks is conceived to be repugnant. He contends that the act violates sections 3, 17, and 19 of article 1 of the Constitution of Texas, and section 1 of the Fourteenth Amendment to the Constitution of the United States, and impinges upon the equal rights of citizens which all the above-designated portions of those fundamental documents were designed to make secure.

The exact expressions of the state and national Constitutions under which appellant seeks cover are set out in order to afford a convenient consideration of his contentions. Sections 3, 17, and 19 of article 1, state Constitution, are as follows:

Sec. 3. "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." Sec. 17. "No person's property shall be taken, damaged or destroyed for, or applied to, public use without adequate compensation being made, unless by the consent of such person; and when taken, except for the use of the state, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncon-

trollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature, or created under its authority, shall be subject to the control thereof." Sec. 19. "No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

Section 1 of the Fourteenth Amendment to the United States Constitution is as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[1] The case presented to us closes every avenue through which we may come to a determination of the rights of the parties, except by way of construing the statute by the test of the constitutional provisions above quoted. We are not presented with the alternative of disposing of the case upon some other ground and leaving out of consideration the validity of the portion of the statute assailed. The course to which courts throughout the land have always closely adhered is to avoid treatment of a statute, the treatment of which in consonance with their sound judgment and cautious deliberation condemns as erroneous the action of the legislative department of government, if the rights of litigants can otherwise properly be adjudicated.

"It is both more proper and more respectful to a co-ordinate department to discuss constitutional questions only when that is the very lis mota."

While the validity of the act of 1915 has heretofore been assailed in other cases, its constitutionality has not been passed upon in such cases, because in those cases other grounds were available to the courts upon which to dispose of them, and in pursuance of the policy above mentioned the courts have properly treated the rights of the parties altogether upon such other grounds.

"In declaring a law unconstitutional, a court must necessarily cover the same ground which has already been covered by the legislative department in deciding upon the propriety of enacting the law, and they must indirectly overrule the decision of that co-ordinate department. The task is therefore a delicate one, and only to be entered upon with reluctance and hesitation. It is a solemn act in any case to declare that that body of men to whom the people have committed the sovereign function of making the laws for the commonwealth have deliberately disregarded the limitations imposed upon this delegated authority, and

usurped power which the people have been careful to withhold; and it is almost equally so when the act which is adjudged to be unconstitutional appears to be chargeable rather to careless and improvident action, or error in judgment, than to intentional disregard of obligation. But the duty to do this in a proper case, though at one time doubted, and by some persons persistently denied, it is now generally agreed that the courts cannot properly decline, and in its performance they seldom fail of proper support if they proceed with due caution and circumspection, and under a proper sense as well of their own responsibility as of the respect due to the action and judgment of the lawmakers." Cooley's Const. Lim. 193.

[2] The Legislature is omnipotent in all instances except where a limitation set upon its powers appears embedded in the Constitution, either from express inhibitions written there or from clear and conclusive implication. Its acts cannot be questioned by courts merely because judges consider them unwise, improvident, oppressive, or otherwise unsound, if a constitutional restriction which they transcend and override cannot be definitely indicated. Express grant of constitutional authority need not appear in order to give force and validity to its enactments. On the contrary, as above stated, the violation of constitutional restriction must appear in order to annul and invalidate them. The amendment of 1915, above quoted, was an attempt to exercise the police power. All the authorities recognize the wide range of discretion Legislatures possess in the exercise of this power, and recognize that the propriety of its exercise is beyond the circumscription set around the realm of judicial inquiry. L. & N. Ry. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849. The manner and effect of its exercise by the Legislature can be challenged by the judiciary only when some constitutional provision is invoked as having been violated in enacting the law. Historically and inherently the police power, in our American constitutional system, is deposited in the Legislature, to be used unrestrained except by the restraint the people, in the exercise of their supreme sovereignty, have written into the fundamental law, from which the Legislature, along with the other departments of government, derives not merely its powers but its existence also. That restraint, and that alone, it must regard. And upon a case being presented evidencing beyond doubt a disregard of that restraint, then, and not before, the courts, in the exercise of prerogatives derived from the same authority as that from which those exercised by the Legislature proceed, will intervene to uphold the commands of the Constitution, the supreme law.

The question, therefore, for ultimate determination is whether or not the portions of

the state and federal Constitutions above cited are violated by the act of 1915, generally known as the Landlord and Tenant Act? In arriving at a conclusion with reference to this question it is necessary to notice, not alone the statute and the constitutional provisions appellant sets up against it, but also to consider interpretations of police power and the construction by courts of statutes designed to exercise it.

The amendment is a restriction upon, an impairment of, the right of contract between owners of agricultural land and those who seek to rent it. But such restriction cannot be said to be violative of any constitutional prerogative if renting land or tilling land under a rent contract is a transaction which affects such property with a public use as distinguished from a use in which the public has some interest. Nor is the restriction to be declared uncontitutional if tenants of farm lands can be said to be a class of people fairly and justly differentiated from others, and encompassed in a situation such that the welfare and interests of the whole public demand this legislation as a reasonable means for the promotion of the health, peace, morals, education, or general welfare of all the people. In either of such events, the law might be a proper exercise of the police power—a power inherent in the Legislature to be exercised for the general welfare always, but never for the arbitrary destruction of rights guaranteed by the Constitution.

[3] The object of the police power is "to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources and add to its wealth and prosperity." Barbier v. Connolly, 113 U. S. 31, 5 Sup. Ct. 359, 28 L. Ed. 923.

"It [the police power] is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance." Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385.

The police power is that authority "which resides in every sovereignty to pass all laws for the internal regulation and government of the state necessary for the public welfare. * * * It has limitations; it cannot be arbitrarily exercised so as to deprive the citizen of his liberty and property." People of New York v. Budd, 117 N. Y. 14, 22 N. E. 674, 5 L. R. A. 565, 15 Am. St. Rep. 460.

There is nothing about the ownership, cultivation, or renting of agricultural land for raising grain and cotton to mark it as affected with any strictly public use. On the contrary, all these things are characterized by the most private use. The public cannot therefore have that interest possessed in the case of a public utility or of a monopoly which justifies the infraction of vested private rights and ownership by legislative enactment. This law singles out one particular set of citizens, those who own farm land, and says to them that they shall make only a certain kind of contract for its use. If a particular farm is exceptionally valuable, highly productive, and by reason of improvements and location specially desirable and comfortable for a home, the owner and the man who would rent it can make no contract with reference to all these things, solely because an arbitrary legislative fiat prohibits it.

The owner of urban property is free to say to a tenant, what in a given case is obviously true, that his premises are more desirably located than other premises of the same inherent value, but that the location renders the rental greater, and he will therefore exact this added value in fixing the rent. The tenant is also free to act upon what he plainly perceives to be an element of value arising from the favorable location and bargain accordingly. But while conditions of the same kind exist as to farm property, this law says to the owner that he shall not exploit such advantages, and says to the person whose business judgment dictates that he could profitably bargain with reference to them that he cannot contract with reference to any such element of value. The law thus impairs the ownership of farm land, and amounts to the taking of property without the due course of the law of the land required by the state Constitution. The law in the same way takes from the tenant farmer the right to contract freely for the use of his property and labor, and, while still recognizing him as responsible, competent, and accountable equally with other normal men, says to him that he shall not exercise his judgment and discretion upon a subject of vital interest to him and the other contracting party, but of no concern whatever to the general public. It makes a particular class of citizens the wards of the state in relation to a subject-matter purely private in its nature, and bearing no such peculiar relation to the public interests as superinduces the right of public regulation. It accordingly impairs a fundamental right of the citizen, the right to freely contract with reference to a lawful thing of as little public interest as any other legitimate private undertaking.

The law does not pertain to the health or moral condition of those engaged in farming as tenants. The contracts to which the law applies in no way involve a rule of the landlord placing the tenant under constraint in regard to how he shall labor. It cannot soundly rest upon the theory that ownership of lands is concentrated into a few persons' possession, who create a monopoly affecting the public welfare, and hence requiring control and regulation. The very opposite of this is known to be true, for the ownership

of land is most widely disseminated, and it is a matter of common knowledge that the tendency prevails towards ownership of smaller tracts by individuals.

In their private relations with each other all men in their dealings upon such subjects as the leasing and selling of land in normal times must be free of the kind of interference and restriction interposed by this act in what clearly appears to us to be arbitrary fashion. The maxim that every man must so use his own property as not to injure others has no application in any reasonable view, and cannot be invoked to support the amendment. Isolated cases of oppressive contracts, it is true, may arise. The possibility of such wrongs is always potentially present in most all the relations and transactions among men whatever the subject with which they deal may be. But constitutional rights cannot be supplanted in consideration of this known frailty; nor the police power, fictile though it is, thereby molded in derogation of vested private rights, to anticipate occasional wrongful acts. Increasing rural home ownership, as well as increasing urban home ownership, contributes to the general welfare. The strength, security, and prosperity of the state may all be said to grow in direct proportion to the increase of home ownership among its citizens, and legislative support and encouragement of those who are homeless to acquire homes is altogether wholesome. We are not privileged to inquire into legislative motives here. But granted that the amendment was designed to bring about a decrease in tenancy and promote ownership of homes by farmers, and granted that its practical result would be the achievement of that much to be desired end, yet it still could not be a permissible exercise of police power because it deprives the citizen of property otherwise than "by the due course of the law of the land," and overrides section 19 of article 1 of the Constitution of Texas.

The case of Lochner v. New York, 198 U. S. 56, 25 Sup. Ct. 542, 49 L. Ed. 940, 3 Ann. Cas. 1133, involved the validity of a statute enacted by the Legislature of New York, prescribing the hours of labor in bakeries. In passing upon the act and holding it to be in conflict with the Fourteenth Amendment to the United States Constitution and an improper exercise of police power, the United States Supreme Court, among other things, said:

"It must, of course, be conceded that there is a limit to the valid exercise of the police power by the state. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy and the Legislatures of the states would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext—become another and delusive name for the supreme sovereignty of the state to be exercised free from constitutional restraint. This is not contended for. In every case that comes before this court, therefore, where legislation of this character is concerned and where the protection of the federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable, and appropriate exercise of the police power of the state, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty, or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor.

"This is not a question of substituting the judgment of the court for that of the Legislature. If the act be within the power of the state it is valid, although the judgment of the court might be totally opposed to the enactment of such a law. But the question would still remain: Is it within the police power of the state? and that question must be answered by the court.

"The question whether this act is valid as a labor law, pure and simple, may be dismissed in a few words. There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation of a baker. There is no contention that bakers as a class are not equal in intelligence and capacity to men in other trades or manual occupations, or that they are not able to assert their rights and care for themselves without the protecting arm of the state interfering with their independence of judgment and of action. They are in no sense wards of the state. Viewed in the light of a purely labor law, with no reference whatever to the question of health, we think that a law like the one before us involves neither the safety, the morals, nor the welfare, of the public, and that the interest of the public is not in the slightest degree affected by such an act. The law must be upheld, if at all, as a law pertaining to the health of the individual engaged in the occupation of a baker. It does not affect any other portion of the public than those who are engaged in that occupation. Clean and wholesome bread does not depend upon whether the baker works but 10 hours per day or only 60 hours per week. The limitation of the hours of labor does not come within the police power on that ground.

"It is a question of which of two powers or rights shall prevail—the power of the state to legislate or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates, though but in a remote degree, to the public health, does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate before an act can be held to be valid which interferes with the general right of an individual to be free in his

person and in his power to contract in relation to his own labor."

The Jacobs Case, 98 N. Y. 98, 50 Am. Rep. 636, involved the constitutionality of a statute against the manufacture of cigars in tenement houses. The New York Court of Appeals expressed its view of such legislation in this language:

"Such legislation may invade one class of rights to-day and another to-morrow, and if it can be sanctioned under the Constitution, while far removed in time, we will not be far away in practical statesmanship from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed, and the reaping of grain, and governmental ordinances regulated the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since in all civilized lands regarded as outside of governmental functions. Such governmental interferences disturb the normal adjustments of the social fabric, and usually derange the delicate and complicated machinery of industry and cause a score of ills while attempting the removal of one." Matter of Jacobs, 98 N. Y. 98, 50 Am. Rep. 636.

The case of Jordan v. State, 51 Tex. Cr. R. 531, 103 S. W. 634, 11 L. R. A. (N. S.) 1603, 14 Ann. Cas. 616, involved the constitutionality of a statute of this state making unlawful the issuance of any check, ticket, or written obligation to any servant or employé for labor performed, redeemable, or payable in goods or merchandise, and providing a penalty for its violation. The Court of Criminal Appeals, in a thorough-going opinion by Judge Davidson, declared the law to be unconstitutional, and in the course of the opinion this was said:

"That this is violative of every fundamental principle of the right of contract will hardly need more than the mere statement of the proposition. Police power or police regulation cannot be upheld to the extent that it will prevent the citizenship of this country making such contracts as they see proper, so long at least as the law ignores coercion, or some of those matters that might enter into and prevent a free and untrammeled contract. If the contracting parties prefer to pay off and receive in pay for labor any goods or merchandise, or any commodity that is suitable to the contracting parties, it would be beyond the police power to prevent such contract. We are dealing only with the law as enacted; nor are we alluding to or undertaking to discuss any law that was not intended for the benefit of the weaker and against the strong, or any legislation to prevent coercion on the part of either of the contracting parties. Those questions are not involved in this law, for by its very terms it was enacted to prevent any contract from being entered into between the parties where the pay was to be in goods or merchandise. This law is not a sanitary measure, nor is it enacted to protect infants and insane people; but it is only intended to prevent the laborer from selling his labor or time, ei-

ther or both, to his employer for goods or merchandise. So far as this statute is concerned, he may sell his time or labor for any other consideration than goods or merchandise. * * * The Legislature has no authority to prevent the citizenship of this country from making their own contracts, nor to interfere with the freedom of contract between workman and employer."

The case of Commonwealth v. Perry, 155 Mass. 117, 28 N. E. 1126, 14 L. R. A. 325, 31 Am. St. Rep. 534, treated and held invalid a statute of Massachusetts restricting certain contracts between weavers and their employers. The Supreme Court of Massachusetts' opinion in the case contains this language:

"There are certain fundamental rights of every citizen which are recognized in the organic law of all free American states. A statute which violates any of these rights is unconstitutional and void, even though the enactment of it is not expressly forbidden. Article 1 of the declaration of rights in the Constitution of Massachusetts enumerates among the natural, inalienable rights of men the right 'of acquiring, possession, and protecting property.' * * * The right to acquire, possess, and protect property includes the right to make reasonable contracts, which shall be under the protection of the law."

In the case of Coal Co. v. Harrier, 207 Ill. 624, 69 N. E. 927, 99 Am. St. Rep. 240, this language is used by the Supreme Court of Illinois:

"It is not within the power of the Legislature to provide that one who is possessed of property may not sell it to another, and agree with the purchaser to work for him in payment for it. The privilege of contracting is both a liberty and a property right. * * * The laborer has a right to contract with respect to his labor, and to make such terms and agreements as may be mutually agreeable to him and his employer. They may agree that the labor of one shall be paid for with the property of the other, or the laborer may agree to work in payment of a pre-existing debt, and in either case the rights of the parties are free from interference from the Legislature."

In the case of State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863, the court said:

"The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands; and to hinder him from employing these in what manner he may think proper, without injury to his neighbor, is a plain violation of this most sacred property. It is equally an encroachment both upon the just liberty and rights of the workman and his employer, or those who might be disposed to employ him, for the Legislature to interfere with the freedom of contract between them, as such interference hinders the one from working at what he thinks proper, and at the same time prevents the other from employing whom he

chooses. A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit, and, as incident to this, is the right to labor or employ labor; make contracts in respect thereto upon such terms as may be agreed upon by the parties; to enforce all lawful contracts; to sue and give evidence; and to inherit, purchase, lease, sell or convey property of every kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery, between liberty and oppression."

In the case of State v. Loomis, 115 Mo. 307, 22 'S. W. 350, 21 L. R. A. 789, the following language by the Supreme Court of Missouri appears:

"They single out those persons who are engaged in carrying on the pursuits of mining and manufacturing, and say, 'You cannot contract for labor -payable alone in goods, wares, and merchandise; * * * though of full age and competent to contract, still you shall not have the power to sell your labor for meat and clothing alone, as others may.' It will not do to say that these sections simply regulate payment of wages, for that is not their purpose. They undertake to deny to the persons engaged in the two designated pursuits the right to make and enforce the most ordinary, everyday contracts, a right accorded to all other persons. This denial of the right to contract is based upon a classification which is purely arbitrary, because the ground of the classification has no relation whatever to the natural capacity of persons to contract. * * * Liberty, as we have seen, includes the right to contract as others may, and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the Constitution undertakes to secure to every citizen. Applying the principle of constitutional law before stated, we can come to no other conclusion than this: That these sections of the statute are utterly void. They attempt to strike down one of the fundamental principles of constitutional government. If they can stand, it is difficult to see an end to such legislation, and the government becomes one of special privileges, instead of a compact 'to promote the general welfare of the people.' We place our conclusion on the broad ground that these sections of the statute are not "due process of law,' within the meaning of the Constitution."

The case of Low v. Rees Printing Co., 41 Neb. 127, 59 N. W. 362, 24 L. R. A. 702, 43 Am. St. Rep. 670, determined the invalidity of a statute of Nebraska which provided that 8 hours should constitute a legal day's work, excepting farm and domestic labor, and provided that any employer who should work his employés over the time specified should pay as extra compensation double the amount per hour as paid for previous hours. A contract was made between Low and Printing Company for him to work by the hour and not by the day. The suit was brought by him under the provisions of the statute. The due process clause of the Nebraska Constitution, which the court held the statute violated, was in the exact language of that of our state Constitution. In the course of the opinion the court said:

"Property, in its broader sense, is not the physical thing which may be the subject of ownership, but is the right of dominion, possession, and power of disposition which may be acquired over it; and the right of property preserved by the Constitution is the right, not only to possess and enjoy it, but to acquire it in any lawful mode, or by following any lawful industrial pursuit which the citizen, in the exercise of the liberty guarantied, may choose to adopt. Labor is the primary foundation of all wealth. The property which each one has in his own labor is the common heritage, and, as an incident to the right to acquire other property, the liberty to enter into contracts by which labor may be employed in such way as to the laborer may seem most beneficial, and of others to employ such labor, is necessarily included in the constitutional guaranty. * * * The legislation attempted cannot be defended as a police regulation, as was attempted in argument, for, under pretense of the exercise of 'that power, the Legislature cannot prohibit harmless acts which do not concern the health, safety, and welfare of society. * * * The claim that this act was a proper exercise by the Legislature of its police power cannot be sustained."

In the case of State v. Haun, 61 Kan. 161, 59 Pac. 340, 47 L. R. A. 369, construing a statute of the state of Kansas, the court, among other things, said:

"Under the penal provisions of the statute in question, a laborer who works for a corporation or trust employing 10 or more persons is deprived of his freedom of contract, in that he cannot bargain to receive anything in payment for his labor but lawful money of the United States. While it might be desirable and profitable to the employé of such corporation to receive a horse, or a cow, or a house and lot, in payment of his wages, yet the Legislature prohibits payment in that way, and places the laborer under guardianship, classifying him, in respect to freedom of contract, with the idiot, the lunatic, or the felon in the penitentiary. It has been sought by some judges to justify legislation of this kind upon the theory that, in the exercise of police power, a limitation necessary for the protection of one class of persons against the prosecution of another class may be placed upon freedom of contract. As between persons sui juris, what right has the Legislature to assume that one class has the need of protection against another? In this country the employé to-day may be the employer next year, and laws treating employés as subjects for such protective legislation belittle their intelligence, and reflect upon their standing as free citizens. It is our boast that no class distinctions exist in this country. An interference by the Legislature with the freedom of the citizen in making contracts, denying to a part of the people, possessing sound minds and memory, the right to bargain concerning the equivalent they may

desire to receive as compensation for their labor, is to create or carve out a class from a body of the people, and place that class within the pale of protective laws which invidiously distinguish them from other free citizens, thus dividing by arbitrary fiat equally free and intelligent people into distinctive classes or grades, the one marked by law as the object of legislative solicitude, and the other not. * * * To say that a free citizen can contract for or agree to receive in return for his labor one kind of property only, and that which represents the smallest part of the aggregate wealth of the country, is a clear restriction of the right to bargain and trade, a suppression of individual effort, a denial of unalienable rights. In Tied. Lim. § 178, the author says: 'Laws, therefore, which are designed to regulate the terms of hiring in strictly private employments, are unconstitutional, because they operate as an interference with one's natural liberty, in a case in which there is no trespass upon private right, and no threatening injury to the public. And this conclusion not only applies to laws regulating the rate of wages of private workmen, but also any other law whose object is to regulate any of the terms of hiring, such as the number of hours of labor per day, which the employer may demand. There can be no constitutional interference by the state in the private relation of master and servant except for the purpose of preventing frauds and trespasses."

[4] Authorities in abundant numbers from various states reflecting such views as those above quoted might be cited in support of our conclusion that the exercise of police power assumed in the act under consideration transcends the prohibitions contained in the due process clause of the Constitution. The conclusions adduced in all such cases rest upon judicial application of the "due process" clause in the Constitution of whatever jurisdiction in which the decision may have been rendered. In no state have the people been content to leave the supremacy of the Legislature qualified only by inhibitions upon its powers and rights as to specific matters; but in all the states, in some form of statement, there is written into the Constitution this general and comprehensive defense against invasion by any governmental power of the citizen's right to life, liberty, property, privileges, and immunities, except by due course of the law of the land. This "due process of law" provision uniformly lodged in all American Constitutions everywhere has the common object to fortify against excessive government encroachment, and breathes the same cautious spirit of jealous regard for fundamental personal and property rights. And therefore any construction of a legislative act testing the validity thereof with reference to it, made by the courts of any state, is direct authority for the guidance of the courts of every other state in deciding the constitutionality of statutes of the same nature.

We cite, without further comment, the following additional authorities: Railway Co. v. Dallas, 98 Tex. 415, 84 S. W. 648, 70 L. R. A. 850; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; People v. Steele, 231 Ill. 340, 83 N. E. 236, 14 L. R. A. (N. S.) 361, 121 Am. St. Rep. 321; Holden v. Hardy, 14 Utah, 71, 46 Pac. 756, 37 L. R. A. 107; State, etc., v. Associated Press, 159 Mo. 410, 60 S. W. 91, 51 L. R. A. 151, 81 Am. St. Rep. 368; Taylor on Due Process of Law, c. 10; Cooley's Const. Lims. c. 11 (6th Ed.).

The amendment conflicts with section 1 of the Fourteenth Amendment of the federal Constitution for the same reasons that it conflicts with the due process clause of the Texas Constitution. The parties to this suit are citizens of the United States as well as of Texas, perforce of the definition that article embodies. The enactment is therefore an attempt to abridge the privileges and immunities of a citizen of the United States, and to deprive him of property and to deny him the equal protection of the laws. Since the Fourteenth Amendment commands that none of these things shall be done by any state, the act is repugnant to it with reference to each of them.

The act of the Legislature being in conflict with both the federal and state Constitutions and therefore void, appellee's suit must fall.

The judgment of the court below is accordingly reversed, and judgment is here rendered for appellant.